# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

---

ALAN ROSA,

                    Plaintiffs,

       vs.

X CORP.; X HOLDINGS CORP.; ELON MUSK; STEVE DAVIS; JOHN DOES 1-10 and ABC CORPS. 1-10,

                Defendants.

---

Hon. Brian R. Martinotti
Case No. 2:23-cv-22908-BRM-AME

**ORAL ARGUMENT REQUESTED**

Motion Return Date: May 6, 2024

---

## PLAINTIFF ALAN ROSA'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF
## PERSONAL JURISDCTION AND FAILURE TO STATE A CLAIM

---

### DEUTSCH ATKINS & KLEINFELDT, PC
21 Main Street, Court Plaza South, Suite 352
Hackensack, NJ 07601
Tel: (201)-498-0900
E-mail: batkins@deutschatkins.com
*Attorneys for Plaintiff, Alan Rosa*

*Of Counsel and on the Brief:*
Bruce L. Atkins, Esq.
Debra McGarvey, Eq.
Jason T. Mushnick, Esq.

## <u>TABLE OF CONTENTS</u>

PAGE

TABLE OF AUTHORITIES……………………………………………………....………… iii

PRELIMINARY STATEMENT……………………………………………….....…………1

PROCEDURAL HISTORY………………………………………………………….......3

FACTUAL ALLEGATIONS …………………………………………………….......8

    A. COMMENCEMENT OF PLAINTIFF'S EMPLOYMENT BY DEFENDANTS….…8

    B. PURCHASE OF TWITTER BY DEFENDANT MUSK……………………....………11

    C. DEFENDANTS' RETALIATION AGAINST PLAINTIFF ……………..…....…….12

    D. DEFENDANTS' BREACH OF CONTRACT AND BREACH OF DUTY OF
       GOOD FAITH AND FAIR DEALING WITH PLAINTIFF ....................................16

    E. DEFENDANTS' WARN ACT VIOLATIONS…………………………………..……18

    F. PLAINTIFF'S COMPLAINT……………………………………………..……19

    G. JURISDICTIONAL FACTS……………………………………………...19

LEGAL ARGUMENT……………………………………………………….....…22

  I. LEGAL STANDARDS………………………………………………..……22

    A. LACK OF PERSONAL JURISDICTION…………..……………………..…22

    B. FAILURE TO STATE CLAIM……………………..……………………....…22

  II. THIS COURT HAS *IN PERSONAM* JURISDICTION OVER ALL DEFENDANTS IN
    THIS MATTER……………………………………………………………..…22

    A. A COURT HAS GENERAL JURISDICXTION OVER ALL DEFENDANTS IN
       THIS MATTER………………………………………………………..…22

    B. THIS COURT HAS SPECIFIC JURISDICTION OVER ALL DEFENDANTS IN
       THIS MATTER……………………………………………………..……22

    C. THE COURT'S JURISDICTION OVER DEFEDNANTS COMPORTS WITH
       TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL
       JUSTICE………………………………………….……………………...……29

D. PLAINTIFF DOES NOT OPPOSE DEFENDANT MUCK AND DAVIS'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AS TO THE FEDERAL, NEW YOURK, AND CALIFORNIA WARN ACT CLAIMS, BUT DOES OPPOSE THE MOTION TO DISMISS THE BREAC H OF CONTRACT CLAIM…………………………………………………………...…….31

CONCLUSION ……………………………………………………………....………..31

<u>**TABLE OF AUTHORITIES**</u>

**CASES**                                                                                    **PAGE(S)**

*Am. Fin. Res., Inc. v. Smouse*, No. CV. 17-12019 (JMV) (MF), 2018 WL 6839570, at *5
(D.N.J. Dec. 31, 2018)……………………………………………………………….......32

*Asahi Metal Industry Co., Ltd. v. Superior Court of Cal.*, Solano County,
480 U.S. 102, 116(1987)……………………………………………………………....30

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)……………………………………….......23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)…………………………….......23

*Benitez v. JMC Recycling Sys., Ltd.,* 97 F. Supp.3d 576, 581 (D.N.J. 2015)…………......22

*Provident Nat'l Bank v. Cal. Fed. Say. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)…..........24

*Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)……………………....22

*Daimler AG v. Bauman,* 571 U.S. 117, 127 (2014)…………………………………….....24,25,26

*D'Jamoos ex re. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103-04……......27,32

*Fowler v. UPMC Shadyside*, 478 F.3d 203, 211 (3d Cir. 2009)…………………………....23,24

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)……………..……..25.26

*Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-16 (1984)…………........……24

*Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007)…………………………………......……24

*Mellon Bank (East) PSFS, N.A. v. DiVernonica Bros., Inc.,*
983 F.2d 551, 554 (3d Cir. 1993).................................................................27

*Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004)……………………………..22,24

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007)……………......……29

*Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 603-04 (3d Cir. 1990)…………......22

*Pierce v. Ortho Pharmaceutical Group*, 84 N.J. 58, (1980)…………………………….......…1

*Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008)…………………….......…23

*Pro Sports Inc. v. West*, 639 F.Supp.2d 475, 478 (D.N.J. 2009)…………………….......…22

*Provident Nat'l Bank v. Cal. Fed. Say. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)…...........24

*SDS USA, Inc. v. Ken Specialties, Inc.*, CIV. 99-133, 2002 WL 31055997, at *3 (D.N.J. Aug. 28,2002)……………..... ……………………………………………...……...30

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018)……………………….....27

*Trump Hotels & Casino Resorls, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir. 1998)....…………………………………………………………………...……..23

*Walden v. Fiore*, 571 U.S. 277, 284 (2014)…………………………………………….25,26

*Warlh v. Seldin,* 422 U.S. 490, 501 (1975)…………………………………………….....23

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980)…………………...…..26

*Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir. 2008)………………....…….23

## STATUTES

California Labor Code § 1102.5……………………………………………………………2,19

California WARN Act Cal. Labor Code §1400(a)……..………………….....................passim

Conscientious Employee Protection Act ("CEPA"), *N.J.S.A.* § 34:19-2, et seq………………1,19

Federal WARN Act, 29 U.S.C. §§2101 et seq.,……………………….…..................passim

New York Labor Law § 740……………………………………………………………  2,19

New York WARN Act N.Y. Lab. Law §§ 860 et seq. 136……...……………...................passim

## RULES

*Fed. R. Civ. P.* 12(b)(2)………………………………………………….……………...1,8,22

*Fed. R. Civ. P.* 12(b)(6)…………………………………………………..……………...1,8,22

Fed. R. Civ. P. 8(a)……………………………………………………………………23

**OTHER AUTHORITIES**

Digital Service Act……………………………....………………………………………….13

## PRELIMINARY STATEMENT

Plaintiff Alan Rosa files this brief in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction pursuant to *Fed. R. Civ. P.* 12(b)(2) and Failure to State a Claim pursuant to *Fed. R. Civ. P.* 12(b)(6) filed by Defendants Elon Musk and Steve Davis ("Moving Defendants").

Plaintiff, a former employee of X Corp. and X Holdings Corp. ("X Corp."), previously known as Twitter, was wrongfully terminated in retaliation for objecting to and refusing to engage in conduct he believed to be unlawful contrary to the instructions of Defendants and disclosing this to X Corp.'s Deputy General Counsel and Vice President, Legal. After his termination, Moving Defendants and X Corp. (collectively, "Defendants") breached their contracts entered with Plaintiff, including, inter alia, refusing to honor their obligations under the equity compensation plan, to pay bonuses, and expenses incurred by Plaintiff.

After Plaintiff filed a Demand for Arbitration and paying the initial filing fee, Moving Defendants and X Corp. (collectively, "Defendants") refused to pay the arbitration fees they were obligated to pay under Judicial Arbitration and Mediation Services ("JAMS") Employment Minimum Standards and their own Dispute Resolution Agreement. As a result, Defendants had obstructed the arbitration process such that they were no longer entitled to arbitration pursuant to the relevant law.

Plaintiff thus filed this Complaint against Defendants asserting claims for breach of contract and the duty of good faith and fair dealing, unlawful termination in violation of the Conscientious Employee Protection Act ("CEPA"), *N.J.S.A.* § 34:19-2, et seq., common law retaliation in violation of *Pierce v. Ortho Pharmaceutical Group*, 84 N.J. 58, (1980), violation of New York Labor Law § 740, and violation of California Labor Code § 1102.5, wrongful

termination in violation of public policy, violation of the Federal WARN Act, 29 U.S.C. §§2101 et seq., and violations of the California and New York WARN Acts.

While Defendants contend the facts alleged in the pleadings are insufficient to confer personal jurisdiction on them in the District Court of New Jersey, courts look beyond the pleadings in determining whether they possess personal jurisdiction over a defendant. This Court possesses personal jurisdiction on Defendants in this matter as they have all purposefully availed themselves of minimum contacts in New Jersey sufficient to confer both specific and general personal jurisdiction over them here.

Plaintiff is a resident of New Jersey and was hired by Twitter and commenced employment as its Head of Global Information Technology and Information Security on January 24, 2022. Plaintiff's offer letter which is signed and dated December 13, 2021 clearly sets forth Plaintiff's residence in New Jersey. Defendant Musk subsequently acquired the company and became its CEO immediately taking action to lay off half of Twitter's workforce. Plaintiff subsequently met with Defendant Musk to discuss his new role at Twitter as Head of IT, Security and Privacy Teams. While this meeting was over Google Teams, Defendant Musk was fully aware that Plaintiff was present in New Jersey and that Plaintiff conducted all of his duties from his home in New Jersey with periodic visits to Defendants' New York office. As set forth herein, Defendants all have personally availed themselves of minimum contacts in New Jersey sufficient for this Court to possess personal jurisdiction over them. For these reasons, the Moving Defendants Motion to Dismiss for lack of personal jurisdiction must be denied.

Moving Defendants Musk and Davis also move to dismiss the breach of contract, Federal WARN Act, New York WARN Act, and California WARN Act claims. As Plaintiff is not privy to Defendants' purchase agreements related to the sale of Twitter, Plaintiff needs discovery on this

issue to determine who is responsible for breach of Plaintiff's employment agreements. However, Plaintiff did not intend to bring the Federal WARN Act, New York WARN Act, and California WARN Act claims against Moving Defendants. To the extent there may be any ambiguity in the Complaint on this, Plaintiff hereby withdraws those claims against Musk and Davis from the Complaint. (Doc. No. 1).

## **PROCEDURAL HISTORY**

On December 13, 2021, Plaintiff was provided an offer letter which was addressed to him at his residence in New Jersey to commence his employment, as VP, Information Technology, at Twitter, Inc. on January 24, 2022. See Certification of Alan Rosa in Support of Opposition to Motion to Dismiss dated April 22, 2024 ("Plaintiff's Cert."), ¶ 2 and Exhibit A, Offer Letter dated December 13, 2021. At this time, he was also directed to sign a Dispute Resolution Agreement, of which he could later opt out. See Rosa Cert., ¶ 3 and Exhibit B, Dispute Resolution Agreement dated December 13, 2021. Pursuant to the Offer Letter, Plaintiff was also obligated to sign an Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement") as a condition of his employment. See Rosa Cert., ¶ 4 and Exhibit C, Confidentiality Agreement dated December 13, 2021.

In accordance with the Dispute Resolution Agreement, Plaintiff filed a demand for arbitration against Defendants with JAMS on or about April 14, 2023. See Rosa Cert., ¶ 5 and Exhibit D. On or about May 4, 2023, Plaintiff submitted his initial payment to JAMS. See Rosa Cert., ¶ 6 and Exhibit E, Claimant's Filing Fee Receipt dated May 4, 2023. On May 10, 2023, JAMS forwarded the parties notice as follows:

> Upon review of the Demand [for Arbitration] and accompanying documents JAMS has determined that JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness applies.

>Please carefully review the enclosed Minimum Standards as JAMS requires that the parties comply with them in order to proceed.
>
>The Minimum Standards will apply notwithstanding any contrary provisions in the parties' pre-dispute arbitration agreement. The parties' agreement to proceed constitutes agreement to the foregoing.
>
>Any further issue about whether the Minimum Standards apply should be directed to the arbitrator once he or she is appointed. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. JAMS will then renew the issue, taking the arbitrator's position into consideration, and will make a final determination.

See Rosa Cert., ¶ 7 and Exhibit F, May 10, 2023 JAMS Notice of Determination that JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness Applies.

On May 30, 2023, the parties received a Notice of Commencement of Employment Arbitration from JAMS asking them to mutually agree upon an arbitrator. See Rosa Cert., ¶ 8 and Exhibit G, JAMS Notice of Commencement of Employment Arbitration dated May 30, 2023. The Notice set forth that "JAMS will administer the arbitration consistent with the JAMS Policy on Employment Arbitration, Minimum Standards of Procedural Fairness. According to this Policy, the only fee an employee may be required to pay is $400 of the Filing Fee. All other costs, including the remainder of the Filing Fee, must be borne by the company. JAMS will also administer the case consistent with JAMS Cancellation/Continuance policy." See Rosa Cert., ¶ 9 and Exhibit G.

On June 6, 2023, Plaintiff's counsel emailed correspondence to Defendants' counsel requesting their consent to arbitrate the matter before Michael Young. See Rosa Cert., ¶ 10, Exhibit H, and Atkins Cert. ¶ 4, Email Chain between Plaintiff's Counsel and Defendants' Counsel Consenting to Arbitration before Michael Young. On June 6, 2023, Sarah Nevins, JAMS Arbitration Practice Manager – East/Central, asked Defendants' counsel to confirm the choice of Michael Young as Arbitrator. See Rosa Cert., ¶ 11, Exhibit H and Atkins Cert . ¶ 4. Defendants'

counsel, Kathryn Bonacorsi, Esq. responded that she confirmed.  <u>See</u> Rosa Cert., ¶ 10, Exhibit H, and Atkins Cert. ¶ 4.

On July 13, 2023, Victor Tran, JAMS Case Coordinator, requested that the parties acknowledge receipt of the deposit request and advise as to the payment status for the arbitration. <u>See</u> Rosa Cert., ¶ 13, Exhibit I and Atkins Cert. ¶ 5. Email correspondence regarding payment of arbitration fees. Defendants' counsel Daniel Koffman, Esq. then asked Mr. Tran to clarify whether the "invoice represents 50% of the applicable fees at this stage". <u>See</u> Rosa Cert., ¶ 14, Exhibit I and Atkins Cert. ¶ 5. Mr. Tran responded that "[i]t has been determined that the Employment Minimum Standards apply in this matter. As such, Twitter is responsible for all the arbitration fees with the exception of Claimant's portion of the filing fee. This invoice represents an initial retainer for the Arbitrator to begin working on the case." <u>See</u> Rosa Cert., ¶ 15, Exhibit I and Atkins Cert. ¶ 5.

On July 18, 2023, Mr. Koffman sent email correspondence to Plaintiff's counsel stating "Section 6 of your client's arbitration agreement with Twitter provides that, where (as here) applicable law does not require Twitter to pay all fees for the arbitration, the fees are to be apportioned between the parties. Consistent with this agreement, Twitter is not prepared to pay more than half of the arbitrator fees. Do you agree to having JAMS issue invoices to each party for half the arbitrator fees?" <u>See</u> Rosa Cert., ¶ 16, Exhibit I and Atkins Cert. ¶ 5.

On July 18, 2023, Plaintiff's counsel Debra McGarvey, Esq. responded:

> Section 5 of the arbitration agreement requires that claims for arbitration be brought before JAMS, pursuant to the then-current JAMS Rules. JAMS has already determined that the Employment Minimum Standards apply in this matter because the arbitration agreement was a condition of employment. Section 6 of the agreement does not provide any language stating that it overrides any conflict with JAMS rules. As such, Twitter is responsible for all

of the arbitration fees with the exception of Claimant's portion of the filing fee.

<u>See</u> Rosa Cert., ¶ 17, Exhibit I and Atkins Cert. ¶ 5.

On July 20, 2023, Mr. Koffman, on behalf of Defendants, continued to refuse to pay under

JAMS Rules, stating:

> Debra – we disagree with your construction of the contract, which makes clear that your client must split the arbitration fees unless applicable law requires otherwise. And there is no applicable law that requires otherwise. Your reliance on JAMS Rules is misplaced, as JAMS Rules cannot alter the parties' substantive rights and responsibilities under the agreement they both signed. Under these circumstances, while Twitter is prepared to pay its half of the arbitration fees, it will not pay more than that.

<u>See</u> Rosa Cert., ¶ 18, Exhibit I and Atkins Cert. ¶ 5.

In response, Plaintiff's counsel Bruce L. Atkins, Esq. stated:

> We disagree with you as the agreement is crystal clear in section 5 that the then- current JAMS rules apply. JAMS has already determined that your client pays pursuant to their current rules as stated in the Victor Tran email below. There is no carveout of the JAMS rules in the agreement, therefore JAMS rules clearly apply to BOTH parties. Its your client's contract and therefore strictly construed as to any ambiguity.

> 5. States as follows:

> Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

<u>See</u> Rosa Cert., ¶ 19, Exhibit I and Atkins Cert. ¶ 5.

On July 21, 2023, John Graber, JAMS Case Manager stated:

Noting below the language from July 18 but also noting; after the initial deposits are paid, the parties can discuss this issue directly with the arbitrator. Please let me know if any questions. Thank you.

It has been determined that the Employment Minimum Standards apply in this matter. As such, Twitter is responsible for all the arbitration fees with the exception of Claimant's portion of the filing fee. This invoice represents an initial retainer for the Arbitrator to begin working on the case. Once we receive payment of the initial retainer, our office will schedule a preliminary conference to set the schedule of the arbitration.

See Rosa Cert., ¶ 20, Exhibit I and Atkins Cert. ¶ 5.

Mr. Koffman responded on July 31, 2023 stating as follows:

Mr. Graber, Mr. Tran, and counsel – X Corp. is not prepared to pay more than half of the arbitration fees in this matter. The underlying contract and applicable law are clear that the parties divide the cost of any arbitration, and JAMS Rules cannot alter the parties' substantive rights and responsibilities under the agreement they both signed. Under these circumstances, while X Corp. is prepared to pay its half of the arbitration fees, it will not pay more than that.

See Rosa Cert., ¶ 21, Exhibit I and Atkins Cert. ¶ 5.

Mr. Graber then stated: "As mentioned, any issues regarding the fee split can be presented to the Arbitrator once we are ready to proceed- which will be once the $5,000 is paid by Respondent. Thank you." See Rosa Cert., ¶ 22, Exhibit I and Atkins Cert. ¶ 5.

Defendants did not make the payment contrary to JAMS Minimum Standards of Procedural Fairness, which their own Dispute Resolution Agreement stated applies. See Rosa Cert., ¶ 23. Mr. Graber advised that he would close the file soon if payment was not made. See Rosa Cert., ¶ 24. Defendants refused to pay their portion of the arbitration fees even though they would have later had the opportunity to dispute whether JAMS Minimum Standards of Procedural Fairness applied in this case, as set forth in the May 10, 2023 Notice. See Rosa Cert., ¶ 25 and Exhibit F. As a result of Defendants' non-payment, JAMS closed their arbitration file. See Rosa Cert., ¶ 26.

On December 5, 2023, Plaintiff filed his Complaint and Demand for Jury Trial in this matter. See Rosa Cert., ¶ 27 and Exhibit J, Complaint and Demand for Jury Trial filed on December 5, 2023 ("Dkt. No. 1"). On or about February 5, 2024, Plaintiff subsequently agreed to a stipulation with Defendants to an extension of time to answer, plead or otherwise respond to Plaintiff's Complaint by March 22, 2024. (Dkt. No. 6). On February 6, 2024, the Hon. Brian R. Martinotti, U.S.D.J., entered the Order granting the extension of time to answer, plead or otherwise respond to Plaintiff's Complaint by March 22, 2024. (Dkt. No. 7).

On March 22, 2024, Moving Defendants Elon Musk and Steve Davis filed the subject Motion to Dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 8). On March 22, 2024, despite refusing to comply with JAMS requests for payment in order to proceed with the Arbitration, Twitter ironically filed a Motion to Compel Arbitration which is returnable on the same date as this Motion to Dismiss. (Dkt. No. 9).

## FACTUAL ALLEGATIONS

### A.  Commencement of Plaintiff's Employment by Defendants

On December 13, 2021, Twitter, Inc. provided Plaintiff an offer letter to commence employment by Twitter as its VP, Information Technology on January 24, 2022. See Rosa Cert., ¶ 2 and Exhibit A. Plaintiff signed the offer letter on December 13, 2022. The offer letter was addressed to Plaintiff at his residence in New Jersey. See **Id.** Twitter's Offer Letter provided:

> To accept this offer, please initiate the authorization of your background check, and sign and date this offer letter, and the other documents enclosed with this letter (including the Confidentiality Agreement and Dispute Resolution Agreement) and return them via AdobeSign.

See Id.

The Confidentiality Agreement enclosed with the Offer Letter, titled Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement"), provided that

> In consideration of, and as a condition of my employment, continued employment, access to confidential and trade secret information, benefits, certain monies, bonuses, and/or other benefits with Twitter, Inc., a Delaware corporation (the "Company"), I hereby represent to, and agree with the Company as follows:
>
> 1. **Purpose of Agreement.** I understand that the Company is engaged in a continuous program of research, development, production, and marketing in connection with its business and, furthermore, that it is critical for the Company to preserve and protect: (i) its **"Confidential Information"** (as defined in Section 7 below); (ii) its rights in "Inventions" (as defined in Section 2 below); and (iii) in any and all intellectual property rights related to (i) and/or (ii). Accordingly, I am entering into this Employee Invention Assignment and Confidentiality Agreement (this "**Agreement**") as a condition of my employment with the Company, whether or not I am expected to make, conceive, or reduce to practice Inventions for the Company.

See Rosa Cert., ¶ 4 and Exhibit C.

The Confidentiality Agreement, specifically provides that New Jersey law applies as follows:

> ***This Agreement will be governed by and construed in accordance with the laws of the State in which I reside during the course of my employment***, without giving effect to its laws pertaining to conflict of laws. If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.

See Id.

On December 13, 2021, Plaintiff also entered a Dispute Resolution Agreement with Twitter:

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then ***this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement***. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

See Rosa Cert., ¶ 3 and Exhibit B.

Plaintiff commenced employment at Twitter on January 24, 2022, as Head of Global Information Technology and Information Security. (Dkt. No. 1 at ¶ 27). Twitter was a social media company that employed thousands of individuals across the United States. (Dkt. No 1 at ¶ 26).

-10-

Plaintiff was responsible for the Global Information Technology and Information Security organization (500 Tweeps) across all Twitter businesses headquartered in San Francisco with sites across the United States. (Dkt. No 1 at ¶ 28). Throughout his employment at Twitter and then X Corp., Plaintiff worked remotely from his home in New Jersey with occasional travel to Twitter's office in New York. See Rosa Cert., at ¶ 44.

### B. Purchase of Twitter by Defendant Musk

On or around October 28, 2022, Musk, a multi-billionaire, purchased the Company and assumed ownership. (Dkt. No 1 at ¶ 38). Immediately thereafter, on or around November 1, 2022, Elon Musk began laying off half of the Company's workforce. (Dkt. No 1 at ¶ 39). Prior to Musk's purchase, the FTC charged Twitter with violating the 2011 FTC Order, by collecting users' personal information for the stated purpose of security and then exploiting it commercially. Twitter paid a $150 million-dollar civil penalty and entered into a new consent order on May 26, 2022 ("Twitter FTC Consent Decree"). (Dkt. No 1 at ¶ 40).

The Twitter FTC Consent Decree required Twitter to establish, implement, and maintain a comprehensive privacy and information security program, including substantial new compliance measures to prevent further misleading tactics that threatened the potential privacy and security of confidential user information. (Dkt. No 1 at ¶ 41). Musk was consistently dismissive of the Twitter FTC Consent Decree and Twitter's obligations under it. (Dkt. No 1 at ¶ 42). On or around November 2, 2022, Twitter notified Plaintiff that he had been selected to run the IT, Security, and Privacy teams. (Dkt. No 1 at ¶ 43).

### C. Defendants' Retaliation Against Plaintiff

Shortly after assuming ownership, Musk hired Defendant Davis to serve as a high-level advisor at Twitter giving Davis authority to direct Plaintiff's work activities and/or undertake

tangible employment decisions affecting the Plaintiff. (Dkt. No 1 at ¶ 44). Davis, like Musk, was dismissive of the Twitter FTC Consent Decree and began cutting Twitter's products and services that supported and complied with the Twitter FTC Consent Decree. (Dkt. No 1 at ¶ 45). For example, Davis did not want to pay for vulnerability management software and he resisted paying for the Company's ethical hacking program called "HackerOne". Both programs were necessary for Twitter to comply with the Twitter FTC Consent Decree. (Dkt. No. 1 at ¶ 46). Plaintiff objected to these cuts as he had a reasonable belief that cutting these programs would prevent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order. (Dkt. No 1 at ¶ 47).

On or around November 21, 2022, Davis directed Plaintiff to shut down Salesforce, which is legal case software that enables Twitter to share details with law enforcement entities around the world regarding time-sensitive and important legal matters. (Dkt. No 1 at ¶ 48). Plaintiff objected to the direction to shut down Salesforce due to the dependency between the Legal Case Review platform and Salesforce as the immediate shutdown would violate the Digital Service Act's ("DSA") legal requirements and jurisdictional rules around the globe by compromising Twitter's inability to properly handle law enforcement inquiries. (Dkt. No 1 at ¶ 49). Plaintiff disclosed his objection to Jim Baker, Deputy General Counsel and Vice President, Legal, Twitter, Inc., and reiterated the difficulties and consequences of recklessly turning off the solution without an alternative, as Twitter would be violating the DSA and jurisdictional rules around the globe because the Company would be unable to respond to law enforcement inquiries if Salesforce was abruptly shut down. (Dkt. No. 1 at ¶ 50).

On or around the evening of December 1, 2022, Davis directed Plaintiff to cut the physical security budget by an additional 50% by midnight. This was done in hours, not days. (Dkt. No. 1 at ¶ 51). Plaintiff immediately objected to participating in such activity, as he had a reasonable

belief that such an immediate budget cut, after already cutting the budget by 50%, would put the physical building at risk of violating a Court Order (explained Dkt. No. 1 infra at ¶31) and it posed a substantial danger to public safety. (Dkt. No. 1 at ¶ 52). The physical building, whose security he had to immediately cut, stored over 800 laptops and other electronic devices that were subject to litigation holds, per Court Orders, which required the Company to ensure that the physical data on the laptops and other electronic devices in the building were preserved and were not removed, destroyed, or altered in any way. (Dkt. No. 1 at ¶ 53).

Plaintiff had a reasonable belief that quickly cutting the physical budget again, within hours, without new security measures in place would violate the litigation holds, per the Court Orders, as there would be no way to preserve the physical laptops and other electronic devices to ensure that they were not altered in any way. (Dkt. No. 1 at ¶ 54). Plaintiff also had a reasonable belief that cutting the physical budget again, without new security measures in place, posed a substantial and specific danger to public health and/or safety because there were numerous protestors at the physical building location. (Dkt. No. 1 at ¶ 55).

A few hours following Plaintiff's objection, Davis called Plaintiff, advised him that he was removing Plaintiff's oversight of the physical security team, and abruptly hung up the phone on Plaintiff. (Dkt. No. 1 at ¶ 56). Five days later, on December 6, 2022, Twitter revoked Plaintiff's Company access, without notice, effectively removing Plaintiff from the Company and terminating his employment. (Dkt. No 1 at ¶ 57). Twitter provided no reason for Plaintiff's termination. (Dkt. No. 1 at ¶ 58).

Plaintiff was terminated in retaliation for objecting to the activities of Defendants that the Plaintiff reasonably believed to be unlawful. (Dkt. No. 1 at ¶ 59). Twitter advised Plaintiff, after his termination, that he would receive a severance package, his February 1st vesting compensation,

bonus compensation, and two months of paid COBRA benefits, as this was being provided to all other laid-off Company employees. (Dkt. No. 1 at ¶ 60). Thereafter on December 16, 2022, Twitter advised Plaintiff that his severance paperwork and severance package were being put on hold pending an investigation regarding his conduct during his employment. (Dkt. No. 1 at ¶ 61).

Notably, it was only after Plaintiff objected and disclosed conduct by Musk that he deemed to be illegal following Musk's purchase of Twitter, Defendants, with Musk and Davis at the helm, initiated a frivolous investigation of him. See Rosa Cert., at ¶ 30 and Exhibit K, Email Correspondence between Plaintiff and Katie Marcotte (Snodgrass) dated December 21, 2022 regarding the investigation of Plaintiff. While Defendants never provided a report of the findings of their investigation, it is important to note that a Tweep FAQ dated October 2022 began with a Tweet by Musk dated October 27, 2022 titled "Dear Twitter Advertisers". See Rosa Cert., at ¶ 31 and Exhibit L, Tweep FAQ dated October 2022. It then provided further information on general severance packages if a position is eliminated based on the purchase of Twitter by Defendant Musk. See Rosa Cert., at ¶ 32 and Exhibit L. The Tweep FAQ stated:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
  - Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
  - Pro-rated Performance Bonus Plan compensation at target
  - A cash contribution for health care continuation.

See Id.

Plaintiff was assured that at the close of the investigation if the allegations are unsubstantiated, he would receive an "opt out severance agreement discussed – in exchange for a signed release of claims, [he would] receive 3 months of pay, benefit for 2 months, and payout of his February 1st vest." See Rosa Cert., at ¶ 33 and Exhibit K. Plaintiff never received the general

-14-

severance package in accordance with the October Tweep FAQ. <u>See</u> Rosa Cert., at ¶ 34. Plaintiff

was never advised as to the nature of, nor the outcome of the investigation he was told was initiated,

nor was he interviewed regarding same, despite his many inquiries to the Company. <u>See</u> Rosa

Cert., at ¶ 34 and Dkt. No. 1 at ¶ 62. This was clearly further retaliation against Plaintiff for his

whistleblowing activity. <u>See</u> Rosa Cert., at ¶ 35.

The purported investigation into Plaintiff's conduct was a sham investigation, conducted

in an attempt to deprive Plaintiff of his severance package, his February 1st vesting compensation,

bonus compensation, and two months of paid COBRA benefits that were being provided to all

other terminated Company employees. (Dkt. No. 1 at ¶ 63). At all times Plaintiff's job performance

was beyond satisfactory. (Dkt. No. 1 at ¶ 69). Plaintiff was terminated in an unexplainable fashion

as he did nothing wrong that would justify his termination. (Dkt. No. 1 at ¶ 70). No reason was

provided to Plaintiff explaining why he was being fired. (Dkt. No. 1 at ¶ 70).

Plaintiff was terminated in retaliation for objecting to the activities of Defendants that the

Plaintiff reasonably believed to be unlawful. (Dkt. No. 1 at ¶ 73). Plaintiff is entitled to lost income,

emotional distress damages, and punitive damages. (Dkt. No. 1 at ¶ 74).

### D. <u>Defendants' Breach of Contract and Breach of Duty of Good Faith and Fair Dealing with Plaintiff</u>

Plaintiff's December 13, 2021 signed Offer Letter provided compensation terms. (Dkt. No.

1 at ¶ 30). In addition to Plaintiff's base compensation, the Company agreed to pay Equity

Compensation to Plaintiff as follows:

> Equity Compensation. Subject to the approval of the Compensation
> Committee of the Company's Board of Directors (or an authorized
> subcommittee), you will be granted a specified number of restricted
> stock units of the Company ('RSUs'). The number of RSUs that are
> granted to you, if approved, will be determined by dividing
> $5,000,000.00 USD by the prevailing RSU conversion rate in effect
> during the month in which your employment role commences under

-15-

the terms of this offer letter, rounded up to the nearest whole share. (Note: for the purposes of the RSU grant under this paragraph, your employment commencement date is anticipated to be your Start Date as set out above, unless delayed or deferred for any reason. In the event you have been previously engaged by the Company in any capacity under a different role or arrangement, such prior service will not count for the purposes of your RSU grant). The RSUs will be subject to the terms of the Company's 2013 Equity Incentive Plan and its form of RSU agreement (the 'Equity Documents'). You will vest in 12.5% of the RSUs on the six month anniversary of the first day of the month following your Start Date, provided you have continued to provide services to the Company until that date, and over your next three and a half years of continuous service with the Company you will vest 6.25% per quarter, as will be further described in the Equity Documents. Be advised that the calculation used to determine the number of RSUs granted is determined in the sole discretion of the Company and will not correlate to any published stock price on your date of hire and, furthermore, does not denote, nor can it predict, the future value of any RSUs. Stock prices are by nature volatile, and there is no way to predict the value of your future shares, if and when they vest. Subject to your continued employment in an equity eligible role, you will be eligible to receive future equity grants.

Per the employment agreement, Twitter issued Restricted Stock Units ("RSUs"), which represent full-value shares, to Plaintiff, subject to the vesting plan and distribution schedule. (Dkt. No. 1 at ¶ 31). Per the employment agreement, 12.5% of the RSUs that were issued to Plaintiff vest on the first day of the month following the Plaintiff's six-month anniversary of his Company start date. (Dkt. No. 1 at ¶ 32). Thereafter, per the employment agreement, 6.25% of the RSUs that were issued to Plaintiff vest per quarter over the next three and half years. (Dkt. No. 1 at ¶ 33). On or about August 1, 2022, 12.5% of the RSUs that were issued to Plaintiff vested, and the Plaintiff was paid per the vesting plan and distribution schedule. (Dkt. No. 1 at ¶ 34). In November/December 2022, Plaintiff had approximately 5.82 million in remaining shares, which were expected to vest over the next three years, with the first vesting on February 1, 2023, in the amount of $363,878.43. (Dkt. No. 1 at ¶ 35). In addition to Plaintiff's base compensation and

Equity Compensation, per the employment agreement, the Company agreed to pay the Plaintiff a performance bonus award as follows:

> Performance Bonus Plan. You may be eligible to earn a discretionary performance bonus award in accordance with the Company's discretionary Performance Bonus Plan as it may exist and/or be amended from time to time. For the current Performance Bonus Plan year, the Performance Bonus Plan target for your position is 40% of annual eligible earnings, paid pursuant to the terms and conditions in the Performance Bonus Plan.

Plaintiff was expected to receive his 2022 earned performance bonus award in the amount of $200,000 in February 2023. (Dkt. No. 1 at ¶ 37). Plaintiff's termination was a deliberately timed, bad faith effort to deprive Plaintiff of his equity compensation and performance bonus as set forth in his employment agreement. (Dkt. No. 1 at ¶ 65).

Plaintiff was terminated approximately one month before he was to receive his bonus compensation in the amount of $200,000 and his February 1, 2023 vested equity compensation in the amount of $363,878.43. (Dkt. No. 1 at ¶ 67). The termination of Plaintiff was a deliberate effort by Defendants to deprive Plaintiff of his bonus compensation and equity compensation in the total amount of 5.8 million shares owed to Plaintiff and divert it to Twitter. (Dkt. No. 1 at ¶ 67). Further, Twitter refused to reimburse Plaintiff for his then-existing legitimate business expenses in the amount of $4,800, in violation of Company policy. (Dkt. No. 1 at ¶ 64).

### E.  **Defendants' WARN Act Violations**

X Corp. was, and is, subject to the notice and back pay requirements of the federal WARN Act because X Corp. is a business enterprise that employed 100 or more employees, excluding part-time employees, and/or employed 100 or more employees who in the aggregate work at 4,000 hours per week (exclusive of overtime) as defined in the WARN Act 29 U.S.C. §§2101(a)(1)(A) and (B). (Dkt. No. 1 at ¶ 130). Twitter engaged in conducting mass layoffs, including laying off

Plaintiff, but failed to provide Plaintiff with the required notice under the federal WARN Act. (Dkt. No. 1 at ¶ 131).

Twitter was, and is, subject to the notice and back pay requirements of the California WARN Act because Twitter is a covered establishment that employed 75 or more employees as defined in the California WARN Act., Cal. Labor Code §1400(a). (Dkt. No. 1 at ¶ 134). Twitter was, and is, subject to the notice and back pay requirements of the New York WARN Act because Twitter is a business enterprise that employed 50 or more employees as defined in the New York WARN ACT, N.Y. Lab. Law §§ 860 et seq. 136. (Dkt. No. 1 at ¶ 135). Twitter engaged in conducting mass layoffs, including laying off Plaintiff, but failed to provide Plaintiff with the required notice under the California and New York WARN Acts. (Dkt. No. 1 at ¶ 136).

### F.  **Plaintiff's Complaint**

On December 5, 2023, Plaintiff brought this suit seeking legal and equitable relief against Defendants for (1) Breach of Contract and Breach of Duty of Good Faith and Fair Dealing; (2) unlawful termination in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. §34:19-1 et seq.; (3) common law retaliation; (4) violations of New York Labor Law §740 and California Labor Code §1102.5; (5) wrongful termination in violation of public policy; and (6) violations of the federal WARN Act, 29 U.S.C. §§2101 et seq., the California WARN Act, Cal. Lab. Code §1400 et seq. and New York WARN Act, N.Y. Lab. Law §§ 860 et seq.

### G.  **Jurisdictional Facts**

Plaintiff is a resident of New Jersey and was hired by Twitter and commenced employment as VP, Information Technology on January 24, 2022. See Rosa Cert., at ¶ 36.  In addition to my offer letter, my pay stubs and W2s are all addressed to my New Jersey residence. See Rosa Cert., at ¶ 37.  Twitter purposefully availed itself in the state of New Jersey by hiring Plaintiff and

entering an employment agreement with him on December 13, 2021 pursuant to the signed offer letter addressed to Plaintiff at his New Jersey residence. See Rosa Cert., at ¶ 36 and Exhibit A. Pursuant to the offer letter, Plaintiff was obligated to sign an Employee Invention Assignment and Confidentiality Agreement (the "Confidentiality Agreement"). See Rosa Cert., at ¶ 38 and Exhibit A.

The Confidentiality Agreement was required to be signed as a condition of Plaintiff's employment which he did. See Rosa Cert., at ¶ 39 and Exhibit C.  The Confidentiality Agreement specifically provided that it was governed by the laws of the state in which Plaintiff resides, which is New Jersey. See Rosa Cert., at ¶ 39 and Exhibit C.

Plaintiff was also obligated to sign the Dispute Resolution Agreement as part of his employment, which he could later opt out of 30 days later. Pursuant to the Dispute Resolution Agreement. See Rosa Cert., at ¶ 40 and Exhibit B.  The Dispute Resolution Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies or termination of employment. It can only be revoked or modified by a writing ,signed by both Plaintiff and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. See Rosa Cert., at ¶ 41 and Exhibit B.  The Dispute Resolution Agreement further provides:

> Unless the Employee and Company mutually agree otherwise, the arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS") . . . . The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported

-19-

> to work for the Company, unless each party to the arbitration agrees in writing otherwise.

See Rosa Cert., at ¶ 42 and Exhibit B

Defendant Musk subsequently purchased Twitter and formally changed the name of the Twitter to X Corp thereby assigning all rights to Twitter's employment agreements with Plaintiff, including his offer letter, the Confidentiality Agreement and Dispute Resolution Agreement. Musk is the Chief Executive Officer of X Corp., which was formally Twitter. See Rosa Cert., at ¶ 43. He met with Plaintiff, who was in his home in New Jersey, via Google Meet and discussed with him his new position of Head of Global Information Technology, Information Security and Privacy. See Rosa Cert., at ¶ 45.

Throughout his employment, Defendants all permitted Plaintiff to continue carrying out his job duties in his home in New Jersey with occasional travel to Twitter's office in New York City. See Rosa Cert., at ¶ 44.  In or about November of 2022, Defendant Musk changed the work from home policy to require employees to work in the office and gave employees approximately 90 days to comply with the new policy. See Rosa Cert., at ¶ 44.   Plaintiff was terminated before he was obligated to begin working in the New York office. As such, throughout his employment, Plaintiff reported to work from his home in New Jersey. See Rosa Cert., at ¶ 44.

After Musk acquired Twitter, Plaintiff met with Defendant Musk to discuss his new role as Head of IT, Security and Privacy Teams. See Rosa Cert., at ¶ 45.  Plaintiff would meet with Musk and Davis over Google Meet from his home in New Jersey. See Rosa Cert., at ¶ 46.   Both Musk and Davis were fully aware that Plaintiff was present in New Jersey and that Plaintiff conducted the majority of his business duties from his home in New Jersey. See Rosa Cert., at ¶ 47.  Additionally, Plaintiff's replacement who still works for X Corp. is a New Jersey resident working for Defendants from his home. See Rosa Cert., at ¶ 48.

-20-

For these reasons, Defendants have all personally availed themselves of minimum contacts in New Jersey sufficient for this Court to possess personal jurisdiction over them. Therefore, the Moving Defendants Motion to Dismiss for lack of personal jurisdiction must be denied.

Moving Defendants Musk and Davis also move to dismiss the breach of contract, Federal WARN Act, New York WARN Act, and California WARN Act claims. As Defendants breached the Dispute Resolution Agreement with Plaintiff, subjecting him to damages including arbitration fees, the Motion to Dismiss as to the breach of contract claims should be denied. However, Plaintiff did not intend to bring the Federal WARN Act, New York WARN Act, and California WARN Act claims against Moving Defendants. To the extent there may be any ambiguity in the Complaint on this, Plaintiff hereby withdraws those claims against Musk and Davis from the Complaint.

## LEGAL ARGUMENT

### I.   LEGAL STANDARDS

#### A.  LACK OF PERSONAL JURISDICTION

A motion to dismiss for lack of personal jurisdiction is governed by *Fed. R. Civ. P.* 12(b)(2). The plaintiffs bear the burden to prove by a preponderance of the evidence that the exercise of personal jurisdiction by the Court is proper. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992); *Pro Sports Inc. v. West*, 639 F.Supp.2d 475, 478 (D.N.J. 2009). "[W]hen the Court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Bare pleadings alone are insufficient to withstand a motion to dismiss for lack of personal jurisdiction. *Patterson v. Fed. Bureau of Investigation*, 893 F.2d

595, 603-04 (3d Cir. 1990). "To sustain her burden, a plaintiff must establish jurisdictional facts 'through sworn affidavits and competent evidence.'" *Benitez v. JMC Recycling Sys., Ltd.*, 97 F. Supp. 3d 576, 581 (D.N.J. 2015). Plaintiff must respond to the motion with actual proofs and not mere allegations. *Ibid.*

### B.  FAILURE TO STATE A CLAIM

The standard for a motion to dismiss for failure to state a claim upon which relief can be granted is governed by *Fed. R. Civ. P.* 12(b)(6). A complaint will not survive a *Fed. R. Civ. P.* 12(b)(6) motion to dismiss unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warlh v. Seldin,* 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorls, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court case of *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Fed. R. Civ. P. 8(a) does **not** require that a complaint contain detailed factual allegations.

Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678 Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See Id.* at 570; see *also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal,* 556 U.S. at 678 (2009). A Complaint must do more than allege the plaintiff's entitlement to relief. A complaint must show such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 478 F.3d 203, 211 (3d Cir. 2009).

## II.   THIS COURT HAS *IN PERSONAM* JURISDICTION OVER ALL DEFENDANTS IN THIS MATTER

When a defendant is a non-resident of the state in which the federal court sits, the court may assert personal jurisdiction over the defendant to the extent authorized by the law of the state. *Carteret*, 954 F.2d at 144-45; *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). New Jersey's rule on long-arm jurisdiction permits the exercise of personal jurisdiction to the fullest extent allowable under the United States Constitution. *See N.J. Court Rule* 4:4-4(c); *Miller Yacht Sales*, 384 F.3d at 96. As such, New Jersey's long arm jurisdiction extends to the limits of the Fourteenth Amendment Due Process Clause. *Carteret*, 954 F.2d at 145. Personal jurisdiction over a non-resident defendant is proper in this Court if the Defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Provident Nat'l Bank v. Cal. Fed. Say. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). There are two recognized types of personal jurisdiction. The first is general jurisdiction, which is also known as an "all purpose" jurisdiction and specific jurisdiction which is "case linked." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1779 (2017); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-

16 (1984). The operative inquiry is "whether that corporation's affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum state." *Daimler AG v. Bauman,* 571 U.S. 117, 127 (2014) (citation and internal quotation marks omitted; brackets in original).

All Defendants purposefully availed themselves of minimum contacts in New Jersey sufficient for this Court to exercise *in personam* jurisdiction over them. Defendants, through their predecessor Twitter, Inc. hired Plaintiff addressing his offer letter to him at his residence in New Jersey. See Rosa Cert., at at ¶ 36 and Exhibit A. Further, pursuant to their employment agreements with Plaintiff, Defendants were bound to the law of the state in which Plaintiff resided. See Rosa Cert., at ¶ 39 and Exhibit C. Further, all Defendants knowingly breached their agreements, including their Dispute Resolution Agreement by refusing to pay the arbitration fee pursuant to their own Dispute Resolution Agreement, which they entered with him knowing he resided in New Jersey. See Rosa Cert., at ¶¶ 8-26 and Exhibit C. This conduct was directed at New Jersey and the effects were felt in New Jersey where Plaintiff resides. Therefore, Defendants, including Musk and Davis, are all subject to the general and specific personal jurisdiction of this Court.

## A. THIS COURT HAS GENERAL JURSIDICTION OVER ALL DEFENDANTS IN THIS MATTER.

A court has general jurisdiction over a foreign corporation "to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Bauman*, 571 U.S. 117, 127 (2014). The test is whether the connections are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Ibid.* A corporation is "at home" in the state(s) in which it is incorporated or has its principal place of business. *See*

*Daimler*, 571 U.S. at 137-138 (*citing Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011).

Here, Defendants Musk and Davis are subject to the general jurisdiction of the District Court of New Jersey having employed Plaintiff knowing he resided in New Jersey and meeting with him on Google Meet to conduct business. <u>See</u> Rosa Cert., at ¶¶ 46-47.  During these meetings, Musk and Davis knew Plaintiff was in his home in New Jersey. <u>See</u> Rosa Cert., at ¶ 47. Additionally, Musk and Davis replaced Plaintiff with another New Jersey resident making their affiliations with the State of New Jersey continuous and systematic rendering them at home in the forum. <u>See</u> Rosa Cert., at ¶ 48. Plaintiff's replacement continues to work for Defendants in his home in New Jersey. Therefore, as Defendants Musk and Davis have purposefully availed themselves of these minimum contacts in New Jersey, this Court may exercise general jurisdiction over Defendants Musk and Davis.

## B. THIS COURT HAS SPECIFIC JURISDICTION OVER ALL DEFENDANTS IN THIS MATTER.

To exercise specific jurisdiction over a nonresident defendant, a state must inquire into the relationship among the defendant, the forum, and the litigation. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The Supreme Court has held that for a court to constitutionally exercise specific jurisdiction the suit must "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb.*, 137 S. Ct. at 1780 (quoting *Daimler*, 134 S. Ct. at 749) (internal alterations and quotation marks omitted). There must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A.*

*v. Brown*, 564 U.S. 915, 919 (2011)). In other words, there must be a "connection between the forum and the specific claims" brought by plaintiff. *Id.* at 1781.

Even some tenuous contact by a defendant with the forum state by way of the plaintiff's injury (which is absent in this case) is insufficient to confer specific jurisdiction. *Walden*, 134 S. Ct. at 1125. The proper question is whether the defendant's conduct connects him to the forum in a meaningful way." *Ibid.* "[T]he relationship must arise out of contacts that the defendant himself creates with the forum State, [for] [d]ue process limits on a state's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* at 1122 (emphasis added) (internal quotations and citation omitted); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980) ("the mere 'unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State.'") (quoting *Hanson*, 357 U.S. at 253).

As the Third Circuit explained in *Mellon Bank (East) PSFS, N.A. v. DiVernonica Bros., Inc.*, 983 F.2d 551, 554 (3d Cir. 1993):

> Specific jurisdiction exists only where the defendant has sufficient minimum contacts with the forum state that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The "'constitutional touchstone'" is whether the defendant purposefully established those minimum contacts. *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 690 (3d Cir.) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)), cert. denied, 498 U.S. 847 (1990). A court must find that there was some act by which the defendant **"purposefully avail[ed] itself"** of the privilege of conducting activities within the forum. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

(emphasis added).

Plaintiffs must thus show that Defendants *purposefully availed* themselves of the privilege of conducting activities in New Jersey. "[T]his 'purposeful availment' requirement ensures that a

defendant will not be haled into a jurisdiction solely as a result of 'random,' fortuitous,' or 'attenuated contacts, ... or of the 'unilateral activity of another party or a third person . . ..'" *Burger King*, 471 U.S. at 475. Plaintiff may only establish the necessary minimum contacts to confer specific jurisdiction if they have taken "some act by which [they] purposefully avail[ed themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018); *see Bristol-Myers*, 137 S. Ct. at 1783 ("The bare fact that [a non-resident corporation] contracted with a [resident] distributor is not enough to establish personal jurisdiction in the State."); *D'Jamoos ex re. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103-04 ("Yet it is clear that the critical finding that the defendant purposefully availed itself of the privilege of conducting activities within the forum requires contacts that amount to a deliberate reaching into the forum state to target its citizens.").

Here, Defendants Davis and Musk did deliberately reach into New Jersey to target Plaintiff. Defendants Davis and Musk promoted Plaintiff to be the Head of Global Information Technology, Information Security and Privacy knowing he resided in New Jersey. See Rosa Cert., at ¶ 45. They both would conduct business with Plaintiff on Google Meet fully aware that he was in his home in New Jersey.  See Rosa Cert., at ¶ 46. Further, Musk as CEO of X Corp., formerly Twitter had obligations under the Dispute Resolution Agreement entered with Plaintiff. See Rosa Cert., at ¶ 41. Further, pursuant to the Dispute Resolution Agreement, "the location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company." See Rosa Cert., at ¶ 42. As such, Musk and Davis who were the decision makers related to Plaintiff's employment, See Rosa Cert., at ¶ 46, knew or at the least should have known that they could be subjected to disputes in New Jersey related to Plaintiff's employment. Further,

the Confidentiality Agreement which Plaintiff entered as a condition of his employment specifically stated that the law of the state in which the Plaintiff resides governed his employment. See Rosa Cert., at ¶ 4 and Exhibit C, at Section 17 (Governing Law; Severability).

Plaintiff then filed a Demand for Arbitration against Musk and Davis in compliance with the Dispute Resolution Agreement. See Rosa Cert., at ¶ 5. While Defendants, including Musk and Davis agreed to arbitrate before JAMS, they then expressly breached the terms of the Dispute Resolution Agreement with me, as well as JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness, refusing to pay the arbitration fees. See Rosa Cert., at ¶ 6, 10-12, 16, 22-25. Defendants, including Musk and Davis, all thus directly engaged in conduct breaching the Dispute Resolution Agreement with Plaintiff, a resident of New Jersey who they knew resided in New Jersey. Their conduct was thus directed at New Jersey and the effects of their conduct were felt in New Jersey. Further, Defendants Musk and Davis replaced Plaintiff as Head of Information Technology, Information Security and Privacy with another New Jersey resident who continue to work from his home in New Jersey. See Rosa Cert., at ¶ 48. Further, Defendants were bound to New Jersey law with respect to issues related to employment, giving Courts in the District of New Jersey a stronger interest in litigating this dispute which had consequences in New Jersey. See Rosa Cert., at ¶ 4 and Exhibit C, at Section 17 (Governing Law; Severability).

As Defendants Musk and Davis purposefully availed themselves of minimum contacts in New Jersey, this Court may exercise specific jurisdiction over them. Therefore, Plaintiff respectfully requests that the Motion to Dismiss for Lack of Personal Jurisdiction be denied.

### C. THIS COURT'S JURISDICTION OVER DEFENDANTS COMPORTS WITH TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.

If the first two requirements for specific jurisdiction are met, "a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice." *O'Connor*

-28-

*v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007)) (citing Burger King, 471 U.S. at 476). "The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (emphasis added). "The Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies' and '[t]he procedural and substantive interests of other nations.'" *Id.* (internal citations omitted). Only in "rare cases [do the] minimum requirements inherent in the concept of fair play and substantial justice ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *SDS USA, Inc. v. Ken Specialties, Inc.*, CIV. 99-133, 2002 WL 31055997, at *3 (D.N.J. Aug. 28, 2002)(citing *Asahi Metal Industry Co., Ltd. v. Superior Court of Cal.*, Solano County, 480 U.S. 102, 116 (1987)).

Here, the District Court of New Jersey's exercise of personal jurisdiction over Defendants clearly comports with traditional notions of fair play and substantial justice. Defendant X Corp. has not moved to dismiss the Complaint for lack of personal jurisdiction. The burden on Defendants Musk and Davis here are minimal as they are all represented by the same counsel as X Corp. who does not dispute this Court's personal jurisdiction over them. Additionally, if the Motion is granted, then Plaintiff will be forced to sever the claims against X Corp. form the claims against Musk and Davis and separately litigate them in different Courts. This would severely impact Plaintiff's ability to obtain convenient and effective relief. Further, have two litigations related to the exact same matter would negatively impact the judicial system's interest in obtaining

the most efficient resolution of controversies and would be a waste of judicial resources. X Corp., a company that operates worldwide, and is owned by Musk, one of the richest men in the world would be far less burdened than Plaintiff if he had to litigate in a jurisdiction outside of New Jersey where he resides. Further, all Defendants are represented by the same counsel in this matter. As such, litigating this matter in one matter in the District Court of New Jersey is thus less of a burden on Defendants than it would be if the cases against the various Defendants were required to be severed.

Finally, pursuant to the Confidentiality Agreement, New Jersey law applies. Additionally, Defendants employed Plaintiff, a resident of New Jersey. As such, New Jersey has a much stronger interest than any other State in adjudicating this dispute.

For these reasons, traditional notions of fair play and substantial justice favor maintaining this matter in the District Court of New Jersey. Therefore, Plaintiff respectfully requests that the Motion to Dismiss for Lack of Personal Jurisdiction filed by Defendant Musk and Davis be denied.

### D. PLAINTIFF DOES NOT OPPOSE DEFENDANT MUSK AND DAVIS'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AS TO THE FEDERAL, NEW YORK, AND CALIFORNIA WARN ACT CLAIMS, BUT DOES OPPOSE THE MOTION TO DISMISS THE BREACH OF CONTRACT CLAIM.

Plaintiff does not oppose the Motion to Dismiss of Defendant Musk and Davis with respect to the Federal, New York, and California WARN ACT claims as Plaintiff did not intend those claims to apply to them. However, Plaintiff does oppose the Motion to Dismiss Plaintiff's breach of contract claim. As set forth herein, Defendants Musk and Davis breached the Dispute Resolution Agreement entered with Plaintiff, refusing to pay their portion of the Arbitration fees pursuant to the Dispute Resolution Agreement and JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Plaintiff paid his portion of the arbitration fees. As a result of

Defendants' breach of the Dispute Resolution Agreement, Plaintiff has been thus subjected to damages. Plaintiff will thus be requesting permission to file a Motion to Amend the Complaint with respect to this claim. Therefore, Plaintiff respectfully requests that the Court deny the motion to dismiss for failure to state a claim with respect to Plaintiff's breach of contract claim.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that the Motion to Dismiss for Lack of Personal Jurisdiction be denied. Plaintiff does not oppose the motion to dismiss for failure to state a claim as to the Federal, New York, and California WARN Act claims as to Defendants Musk and Davis. Plaintiff respectfully requests that the Motion to Dismiss the Breach of Contract claim as to Defendants Musk and Davis be denied. Plaintiff appreciates the Court's time and attention to this matter.

Dated: April 22, 2023

**DEUTSCH ATKINS & KLEINFELDT, PC**
*Attorneys for Plaintiff Alan Rosa*

By: */s/ Jason T. Mushnick*
         Jason T. Mushnick, Esq.

**DEUTSCH ATKINS & KLEINFELDT, PC**
21 Main Street, Court Plaza South, Suite 352
Hackensack, NJ 07601
Tel: (201)-498-0900
E-mail: jmushnick@deutschatkins.com
*Attorneys for Plaintiff, Alan Rosa*

-31-