# EXHIBIT D

BRUCE L. ATKINS, ESQ. ID NO.: 021291977
DEBRA M. MCGARVEY, ESQ. ID NO.:01802007
DEUTSCH ATKINS & KLEINFELDT, P.C.
21 Main Street – Suite 352
Court Plaza South West
Hackensack, New Jersey 07601
(201) 498-0900
*Attorneys for Claimant, Alan Rosa*

| | |
|---|---|
| ALAN ROSA,<br><br>                    Claimant,<br><br>v.<br><br>TWITTER, INC.; X CORP. D/B/A TWITTER; X HOLDINGS CORP. D/B/A TWITTER; ELON MUSK; STEVE DAVIS; John Does 1-10, and ABC Corps. 1-10.<br><br>                    Respondents. | **JAMS ARBITRATION ASSOCIATION NEW YORK OFFICE**<br><br><br>**DEMAND FOR ARBITRATION** |

## CLAIMANTS' ARBITRATION DEMAND

Claimant Alan Rosa, by and through his attorneys, Deutsch, Atkins, and Kleinfeldt, P.C. for his Arbitration Demand against Respondents Twitter, Inc., X. Corp. d/b/a Twitter, X Holdings Corp. d/b/a Twitter (collectively referred to as "Twitter"), Elon Musk, and Steve Davis, alleges as follows:

### PARTIES AND ARBITRABILITY

1.      Claimant resides at 701 Galenkamp Court, Wyckoff, New Jersey 07481.

2.      Respondent Twitter, Inc. ("Respondent Twitter" and/or "Twitter" and/or "Company") is a Delaware corporation, with its headquarters and principal place of business at 1355 Market Street #900, San Francisco, California 94103.

3.      Respondent Twitter also has an office at 249 W. 17th Street, New York, NY 10011.

4.      Respondent X Corp. d/b/a Twitter ("Respondent X Corp." and/or "X Corp.") is a privately held corporation, incorporated in Nevada with its principal place of business in San Francisco, California.  Respondent X Corp.'s parent corporation is X Holdings Corp.

5.      Respondent X Holdings Corp. d/b/a Twitter ("Respondent X Holdings Corp." and/or "X Holdings Corp."), a Nevada corporation, is the parent corporation of Respondent X Corp.

6.      Respondent Twitter merged into Respondent X Corp. in or around March 2023. Respondent X Corp. is the successor in interest to Respondent Twitter, Inc., and currently owns Respondent Twitter, Inc.

7.      Respondent Elon Musk ("Musk") assumed ownership of Respondent Twitter and served as Chief Executive Officer at Respondent Twitter at all times relevant to the demand for arbitration with authority to direct Claimant's work activities and/or undertake tangible employment decisions affecting Claimant.

8.      Respondent Steve Davis ("Davis") was a high-level advisor at Respondent Twitter at all times relevant to the demand for arbitration with authority to direct Claimant's work activities and/or undertake tangible employment decisions affecting Claimant.

9.      Claimant worked remotely for Respondent Twitter performing the majority of his job duties from his home in New Jersey.  However, at times, he worked out of the New York office and California office.

10.     Respondents, John and Jane Does 1-10, currently unidentified, are individuals who, on the basis of the direct acts or on the basis of *respondeat superior*, are answerable to the Claimant for the acts set forth herein, and/or are currently unknown employees, Officers, or Board members who were either senior management level employees or Officers who controlled Claimant's

workplace, and supervised Claimant and aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment or Offices at the workplace during working hours, or, to the extent they went beyond the scope of their employment or Offices, Respondents ratified, embraced and added to their conduct. As the parties engage in discovery, Claimant retains the right to amend the Demand for Arbitration to add these individuals.

11.     Respondents, ABC Corporations 1-10, currently unidentified, are unknown entities who, on the basis of the direct acts or on the basis of *respondeat superior* and/or are unknown affiliated corporations or entities or other corporations who have liability for the claims set forth herein. As the parties engage in discovery, Claimant retains the right to amend the Demand for Arbitration to add these entities by name.

12.     The parties entered into a "Dispute Resolution Agreement" in connection with Claimant's employment at Respondent Twitter.

## FACTUAL ALLEGATIONS

13.     Respondent Twitter is a social media company that employs thousands of individuals across the United States.

14.     Claimant commenced employment at Respondent Twitter on January 24, 2022 as Head of Global Information Technology and Information Security.

15.     Claimant was responsible for the Global Information Technology and Information Security organization (500 Tweeps) across all Twitter businesses headquartered in San Francisco with sites across the United States.

16.     Claimant entered into an employment agreement that Respondent Twitter provided to him on or around December 13, 2022.

3

17.     The employment agreement provided compensation terms. In addition to Claimant's base compensation, the Company agreed to pay Equity Compensation to Claimant as follows:

> **Equity Compensation**. Subject to the approval of the Compensation Committee of the Company's Board of Directors (or an authorized subcommittee), you will be granted a specified number of restricted stock units of the Company ('RSUs'). The number of RSUs that are granted to you, if approved, will be determined by dividing $5,000,000.00 USD by the prevailing RSU conversion rate in effect during the month in which your employment role commences under the terms of this offer letter, rounded up to the nearest whole share. (Note: for the purposes of the RSU grant under this paragraph, your employment commencement date is anticipated to be your Start Date as set out above, unless delayed or deferred for any reason. In the event you have been previously engaged by the Company in any capacity under a different role or arrangement, such prior service will not count for the purposes of your RSU grant). The RSUs will be subject to the terms of the Company's 2013 Equity Incentive Plan and its form of RSU agreement (the 'Equity Documents'). You will vest in 12.5% of the RSUs on the six month anniversary of the first day of the month following your Start Date, provided you have continued to provide services to the Company until that date, and over your next three and a half years of continuous service with the Company you will vest 6.25% per quarter, as will be further described in the Equity Documents. Be advised that the calculation used to determine the number of RSUs granted is determined in the sole discretion of the Company and will not correlate to any published stock price on your date of hire and, furthermore, does not denote, nor can it predict, the future value of any RSUs. Stock prices are by nature volatile, and there is no way to predict the value of your future shares, if and when they vest. Subject to your continued employment in an equity eligible role, you will be eligible to receive future equity grants.

18.     Per the employment agreement, Respondent Twitter issued Restricted Stock Units (RSUs), which represent full-value shares, to Claimant, subject to the vesting plan and distribution schedule.

19.     Per the employment agreement, 12.5% of the RSUs that were issued to Claimant vest on the first day of the month following the Claimant's six-month anniversary of his Company start date.

4

20.     Thereafter, per the employment agreement, 6.25% of the RSUs that were issued to Claimant vest per quarter over the next three and half years.

21.     On or about August 1, 2022, 12.5% of the RSUs that were issued to Claimant vested, and the Claimant was paid per the vesting plan and distribution schedule.

22.     In November/December 2022, Claimant had approximately 5.82 million in remaining shares, which were expected to vest over the next three years, with the first vesting on February 1, 2023, in the amount of $363,878.43.

23.     In addition to Claimant's base compensation and Equity Compensation, per the employment agreement, the Company agreed to pay the Claimant a performance bonus award as follows:

> **Performance Bonus Plan**.  You may be eligible to earn a discretionary performance bonus award in accordance with the Company's discretionary Performance Bonus Plan as it may exist and/or be amended from time to time.  For the current Performance Bonus Plan year, the Performance Bonus Plan target for your position is 40% of annual eligible earnings, paid pursuant to the terms and conditions in the Performance Bonus Plan.

24.     Claimant was expected to receive his 2022 earned performance bonus award in the amount of $200,000 in February 2023.

25.     On or around October 28, 2022, Musk, a multi-billionaire, purchased the Company and assumed ownership.

26.     Immediately thereafter, on or around November 1, 2022, Elon Musk began laying off half of the Company's workforce.

27.     Prior to Musk's purchase, the Federal Trade Commission ("FTC") charged Respondent Twitter with violating the 2011 FTC Order, by collecting users' personal information for the stated purpose of security and then exploiting it commercially.  Respondent Twitter paid a

$150 million-dollar civil penalty and entered into a new consent order on May 26, 2022 ("Twitter FTC Consent Decree").

28.     The Twitter FTC Consent Decree required Respondent Twitter to establish, implement, and maintain a comprehensive privacy and information security program, including substantial new compliance measures to prevent further misleading tactics that threatened the potential privacy and security of confidential user information.

29.     Musk was consistently dismissive of the Twitter FTC Consent Decree and Respondent Twitter's obligations under it.

30.     On or around November 2, 2022, Respondent Twitter notified Claimant that he had been selected to run the IT, Security, and Privacy teams.

31.     Shortly after assuming ownership, Musk hired Davis to serve as a high-level advisor at Respondent Twitter giving Davis authority to direct Claimant's work activities and/or undertake tangible employment decisions affecting the Claimant.

32.     Davis, like Musk, was dismissive of the Twitter FTC Consent Decree and began cutting Respondent Twitter's products and services that supported and complied with the Twitter FTC Consent Decree.

33.     For example, Davis did not want to pay for vulnerability management software and he resisted paying for the Company's ethical hacking program called "HackerOne". Both programs were necessary for Respondent Twitter to comply with the Twitter FTC Consent Decree.

34.     Claimant objected to these cuts as he had a reasonable belief that cutting these programs would prevent Respondent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

35.     On or around November 21, 2022, Davis directed Claimant to shut down Salesforce, which is legal case software that enables Respondent Twitter to share details with law enforcement entities around the world regarding time-sensitive and important legal matters.

36.     Claimant objected to the direction to shut down Salesforce due to the dependency between the Legal Case Review platform and Salesforce as the immediate shutdown would violate the Digital Service Act's ("DSA") legal requirements and jurisdictional rules around the globe by compromising Respondent Twitter's inability to properly handle law enforcement inquiries.

37.     Claimant disclosed his objection to Jim Baker, Deputy General Counsel and Vice President, Legal, Twitter, Inc., and reiterated the difficulties and consequences of recklessly turning off the solution without an alternative, as Respondent Twitter would be violating the DSA and jurisdictional rules around the globe because the Company would be unable to respond to law enforcement inquiries if Salesforce was abruptly shut down.

38.     On or around the evening of December 1, 2022, Davis directed Claimant to cut the physical security budget by an additional 50% by midnight.  This was done in hours, not days.

39.     Claimant immediately objected to participating in such activity, as he had a reasonable belief that such an immediate budget cut, after already cutting the budget by 50%, would put the physical building at risk of violating a Court Order (explained *infra* at ¶31) and it posed a substantial danger to public safety.

40.     The physical building, whose security he had to immediately cut, stored over 800 laptops and other electronic devices that were subject to litigation holds, per Court Orders, which required the Company to ensure that the physical data on the laptops and other electronic devices in the building were preserved and were not removed, destroyed, or altered in any way.

41.     Claimant had a reasonable belief that quickly cutting the physical budget again, within hours, without new security measures in place would violate the litigation holds, per the Court Orders, as there would be no way to preserve the physical laptops and other electronic devices to ensure that they were not altered in any way.

42.     Claimant also had a reasonable belief that cutting the physical budget again, without new security measures in place, posed a substantial and specific danger to public health and/or safety because there were numerous protestors at the physical building location.

43.     A few hours following Claimant's objection, Davis called Claimant, advised him that he was removing Claimant's oversight of the physical security team, and abruptly hung up the phone on Claimant.

44.     Four days later, on December 6, 2022, Respondent Twitter revoked Claimant's Company access, without notice, effectively removing Claimant from the Company and terminating his employment.

45.     Respondent Twitter provided no reason for Claimant's termination.

46.     Claimant was terminated in retaliation for objecting to the activities of Respondents that the Claimant reasonably believed to be unlawful.

47.     Respondent Twitter advised Claimant, after his termination, that he would receive a severance package, his February 1st vesting compensation, bonus compensation, and two months of paid COBRA benefits, as this was being provided to all other laid-off Company employees.

48.     Thereafter on December 16, 2022, Respondent Twitter advised Claimant that his severance paperwork and severance package was being put on hold pending an investigation regarding his conduct during his employment.

49.     Claimant was never advised as to the nature of, nor the outcome of the investigation, nor was he interviewed regarding same, despite his many inquiries to the Company.

50.     The purported investigation into Claimant's conduct was a sham investigation, conducted in an attempt to deprive Claimant of his severance package, his February 1st vesting compensation, bonus compensation, and two months of paid COBRA benefits that were being provided to all other terminated Company employees.

51.     Further, Respondent Twitter refused to reimburse Claimant for his then-existing legitimate business expenses in the amount of $4,800, in violation of Company policy.

52.     Claimant's termination was a deliberately timed, bad faith effort to deprive Claimant of his equity compensation and performance bonus as set forth in his employment agreement.

53.     New Jersey law does not permit the actions of firing an employee in order to avoid paying equity compensation or bonus compensation:

> The New Jersey Supreme Court has held that there is an implied covenant of good faith and fair dealing in every contract. *Onderdonk v. Presbyterian Homes of N.J.,* 85 N.J. 171, 182 (1981); *Bak-A-Lum v. Alcoa Bldg. Prod.,* 69 N.J. 123, 129-30, (1976); *Association Group Life, Inc. v. Catholic War Veterans of U.S.,* 61 N.J. 150, (1972); *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, (1965). As a corollary to that proposition, the Court commented that ***it is reasonable to imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement.*** *Onderdonk,* 85 N.J. at 182 (citations omitted). ***A cognizable cause of action for breach of the implied duty of good faith and fair dealing in the employment context exists where the employer attempts to deprive the employee of the benefits of the employment agreement without an honest belief that good cause for discharge is in fact present.*** *See Noye v. Hoffmann- La Roche, Inc.,* 238 N.J. Super. 430,570 A.2d 12 (App. Div. 1990), *certif. denied,* 122 N.J. 146 (1990); *see also Nolan v. Control Data Corp.,* 243 N.J. Super. 420,579 A.2d 1252 (App. Div. 1990).

> In the absence of a contract, there is no implied covenant of good faith and fair dealing under New Jersey law. *See Noye,* 238 N.J. Super. at 433. ***However, an implied obligation of good faith is applicable to those aspects of the employer-employee relationship which are governed by some contractual terms, even if the employment is characterized as being "at-will."*** *Nolan,* 243 N.J. Super. at 429.
>
> *King v. Port Auth,* 909 F. Supp. 938, 941-42 (D.N.J.*1995) (emphasis added),* see also *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130 (1965)("neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words in every contract there exists an implied covenant of good faith and fair dealing").

54.     Claimant was terminated approximately one month before he was to receive his bonus compensation in the amount of $200,000 and his February 1, 2023 vested equity compensation in the amount of $363,878.43.  The termination of Claimant was a deliberate effort by Respondents to deprive Claimant of his bonus compensation and equity compensation in the total amount of 5.8 million shares owed to Claimant and divert it to Respondent Twitter.

55.     Punitive damages are available where executive-level employees of a Company deprive an employee of the benefits of a contract, as the company will be vicariously liable for the malicious actions of its executives/employees.  *Cappiello v. Ragen Precision Industries, Inc.*, 192 N.J.Super. 523, 531-32 (App. Div. 1984).

56.     At all times Claimant's job performance was beyond satisfactory.

57.     Claimant was terminated in an unexplainable fashion as he did nothing wrong that would justify his termination.  No reason was provided to Claimant explaining why he was being fired.

58.     The New Jersey Conscientious Employee Protection Act, <u>N.J.S.A.</u> 34:19-1, *et seq.* ("CEPA"), the New York Labor Law Section §740, and the California Labor Code §1102.5 make

it illegal for an employee to take any adverse employment action against an employee because the employee objects to any activity that the employee <u>reasonably believes</u> to be in violation of a law, rule, or regulation, including any violation involving the deception of or misrepresentation to a client or a governmental entity.  <u>See also,</u> <u>N.J.S.A.</u> 34:19-3(c).  As recognized by the New Jersey Supreme Court:

> The purpose of CEPA is to protect employees who report illegal or unethical work-place activities. So viewed, CEPA is remedial legislation. Consequently, courts should construe CEPA liberally to achieve its remedial purpose. Stated differently, CEPA is supposed to encourage, not thwart, legitimate employee complaints.
>
> *Estate of Roach v. TRW, Inc.*, 164 N.J. 598, 609-610 (2000)(citations omitted)

59.    CEPA permits the recovery of the full spectrum of tort-related damages, including back pay, front pay (lost future wages), emotional distress, reinstatement, and punitive damages. See <u>N.J.S.A.</u> 34:19-5.  Additionally, prevailing claimants may recover attorneys' fees and costs pursuant to the law's fee-shifting provisions.

60.    Claimant was terminated in retaliation for objecting to the activities of Respondents that the Claimant reasonably believed to be unlawful.

61.    Claimant is entitled to lost income, emotional distress damages, and punitive damages.

**COUNT I**
**Breach of Contract**
**Breach of Duty of Good Faith and Fair Dealing**

62.    Claimant repeats and re-alleges the allegations as if specifically set forth herein.

63.    Respondent Twitter and Claimant agreed to certain terms and conditions of employment, specifically as it related to compensation.

11

64.     The agreement between Claimant and Respondent Twitter contained an implied covenant of good faith and fair dealing, which obligated Respondent Twitter to perform the terms and conditions of the agreement fairly and in good faith to ensure Claimant received the benefits to which he was entitled to, that the parties had agreed to, and to refrain from doing any act in a bad faith manner that would deprive Claimant of the benefits of their agreement.

65.     Claimant has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the employment agreement.

66.     Respondent Twitter terminated Claimant less than two months before he was to receive his bonus compensation and his February 1, 2023 vesting deliberately to deprive Claimant of the benefits of his bonus and equity compensation, 5.82 million in shares, which were expected to vest over the next three years, that the parties had agreed to, without an honest belief that good cause for discharging Claimant was present.

67.     Although Respondent Twitter advised Claimant that he would receive his severance package, his February 1st vesting, bonus, and two months of paid COBRA benefits, as was being provided to all other laid-off Company employees, Respondent Twitter never provided it, claiming that it was on hold pending an investigation regarding his conduct during his employment.

68.     The purported investigation into Claimant's conduct was a sham investigation, in an attempt to deprive him of his severance package, his February 1st vesting, bonus, and two months of paid COBRA as the results or reasons for said investigation were never disclosed to him.

69.     Further, Respondent Twitter failed to reimburse Claimant for his legitimate work expense report in the amount of $4,800, which is due and owing.

WHEREFORE, Claimant demands that judgment be entered against Respondents, and seeks the following relief:

(a) Compensatory damages;

(b) Punitive damages;

(c) Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d) Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT II
### Unlawful Termination, New Jersey Conscientious Employee Protection Act
### N.J.S.A. §34:19-1 *et seq.*

70.     Claimant repeats and re-alleges the allegations as if specifically set forth herein.

71.     Respondent Twitter, Inc. is an "employer" within the meaning of N.J.S.A. §34:19-2(a).

72.     Respondent Elon Musk is an "employer" and a "supervisor" within the meaning of N.J.S.A. §34:19-2(a) and (d).

73.     Respondent Steve Davis is an "employer" and a "supervisor" within the meaning of N.J.S.A. §34:19-2(a) and (d).

74.     The actions of Respondents were in direct violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. §34:19-1 *et seq.*

75.     Claimant objected to cutting Respondent Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Respondent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

76.     Claimant reasonably believed that the immediate shutdown of Salesforce was a violation of a law, rule, or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

77.     Claimant reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would violate a law, rule, or regulation because the Company would be violating litigation holds, per Court Orders.  As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

78.     Claimant objected to the conduct and activities of Respondents that Claimant reasonably believed to be unlawful.

79.     Claimant was discharged from employment because he objected to the conduct and activities that Claimant reasonably believed to be unlawful.

WHEREFORE, Claimant demands that judgment be entered against Respondents Twitter, X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, and ABC Corporations 1-10, and seeks the following relief:

(a)     Compensatory damages;

(b)     Emotional distress damages;

(c)     Punitive damages;

(d)     Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(e)     Such other relief as may be deemed just and appropriate under the circumstances.

14

## COUNT III
### Common Law Retaliation in Violation of
### Pierce v. Ortho Pharmaceutical Group, 84 N.J. 58, (1980)

80.   Claimant repeats and re-alleges the allegations as if specifically set forth herein.

81.   Claimant was terminated for declining to perform an act or acts, objecting to and/or complaining about an act or acts that he believed to be a violation of the law, rules, regulations, and/or public policy.

82.   A causal connection exists between Claimant's termination and his whistleblowing activities.

83.   Respondents acted maliciously and willfully in creating a pretextual sham investigation regarding Claimant's conduct.

84.   The actions of Respondent in terminating Claimant were contrary to the public policies of New Jersey and have caused Claimant to suffer damages.

WHEREFORE, Claimant demands that judgment be entered against Respondents, and seeks the following relief:

(a)   Compensatory damages;

(b)   Emotional distress damages;

(c)   Punitive damages;

(d)   Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(e)   Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT IV
### Violation of New York Labor Law §740

85.   Claimant repeats and re-alleges the allegations as if specifically set forth herein.

86.    Claimant was an "employee" of Respondent Twitter pursuant to NY Labor Law §740(1)(a).

87.    Respondent Twitter is an "employer" within the meaning of NY Labor Law §740(1)(b).

88.    Respondent Elon Musk is an "employer" and a "supervisor" within the meaning of NY Labor Law §740(1)(b) and (1)(f).

89.    Respondent Steve Davis is an "employer" and a "supervisor" within the meaning of NY Labor Law §740(1)(b) and (1)(f).

90.    The actions of Respondents were in direct violation of the NY Labor Law §740.

91.    Claimant objected to cutting Respondent Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Respondent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

92.    Claimant reasonably believed that the immediate shutdown of Salesforce was a violation of a law, rule, or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

93.    Claimant reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would violate a law, rule, or regulation because the Company would be violating litigation holds, per the Court Orders. As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical

location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

94.     Claimant also had a reasonable belief that cutting the physical budget again, without new security measures in place posed a substantial and specific danger to the public health and/or safety because there were numerous protestors at the physical building location.

95.     Claimant objected to, and/or refused to participate in any such activity, policy, or practice.

96.     Claimant was proximately terminated from his employment with Respondent Twitter because he objected to, and/or refused to participate in any such activity, policy, or practice.

WHEREFORE, Claimant demands that judgment be entered against Respondents Twitter, X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, and ABC Corporations 1-10 and seeks the following relief:

      (a)    Compensatory damages;

      (b)    Emotional distress damages;

      (c)    Punitive damages;

      (d)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

      (e)    Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT V
### Retaliation in Violation of California Labor Code §1102.5

97.     Claimant repeats and re-alleges the allegations as if specifically set forth herein.

98.     At all times herein, California Labor Code §1102.5 was in effect and binding on Respondents. This section requires Respondents to refrain from retaliating against an employee

for refusing to participate in an activity that he reasonably believes would result in a violation of state or federal statute, or a violation of or noncompliance with a state or federal rule or regulation.

99.    At all times relevant, Respondent Twitter, Inc. was Claimant's "employer" for the purposes of California Labor Code §1102.5.

100.    Respondent Elon Musk was an "employer" and/or a "person acting on behalf of the employer" for the purposes of California Labor Code §1102.5.

101.    Respondent Steve Davis was an "employer" and a "person acting on behalf of the employer" for the purposes of California Labor Code §1102.5.

102.    Claimant objected to cutting Respondent Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Respondent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

103.    Claimant reasonably believed that the immediate shutdown of Salesforce would result in a violation of state or federal statute, or a violation of or noncompliance with a state or federal rule or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

104.    Claimant reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, because the Company would be violating litigation holds, per the Court Orders.  As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical

location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

105.    Claimant also had a reasonable belief that cutting the physical budget again, without new security measures in place would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation because it posed a substantial and specific danger to the public health and/or safety as there were numerous protestors at the physical building location.

106.    Claimant objected to and refused to participate in such activities that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

107.    Respondents retaliated against Claimant for objecting to and refusing to participate in such activities by terminating his employment with the Company.

108.    As a direct and proximate result of such retaliation, Clamant has experienced damages, including loss of salary, bonus, equity compensation, benefits, and emotional distress.

WHEREFORE, Claimant demands that judgment be entered against Respondents Twitter, X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, ABC Corporations 1-10, and seeks the following relief:

      (a)     Compensatory damages;

      (b)     Emotional distress damages;

      (c)     Punitive damages;

      (d)     Attorneys' fees, pre- and post-judgment interest, and costs of suit;

      (e)     Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT VI
### Wrongful Termination in Violation of Public Policy

109.    Claimant repeats and re-alleges the allegations as if specifically set forth herein.

110.    At all times referenced in this Demand for Arbitration, California Labor Code Section §1102.5 was in full force and effect and was binding on Respondents.  This law requires Respondents to refrain, among other things, from retaliating against employees who refuse to participate in or condone conduct they reasonably believe to violate state or federal law.

111.    Claimant was terminated for declining to perform an act or acts, objecting to and/or complaining about an act or acts that he believed to be a violation of the law, rules, regulations and/or public policy.

112.    A causal connection exists between Claimant's termination and his whistleblowing activities.

113.    Respondents acted maliciously and willfully in creating a pretextual sham investigation regarding Claimant's conduct.

114.    The actions of Respondents in terminating Claimant were contrary to the public policies of California and have caused Claimant to suffer damages.

WHEREFORE, Claimant demands that judgment be entered against Respondents, and seeks the following relief:

(a)    Compensatory damages;

(b)    Punitive damages;

(c)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d)    Such other relief as may be deemed just and appropriate under the circumstances.

20

## COUNT VII
### Violation of Federal Warn Act
### 29 U.S.C. §§2101 *et seq.*

115.   Claimant repeats and re-alleges the allegations as if specifically set forth herein.

116.   Claimant is entitled to the rights, protections, and benefits provided under the federal WARN Act, 29 U.S.C. §§2101 et *seq.*

117.   Respondent Twitter was, and is, subject to the notice and back pay requirements of the federal WARN Act because Respondent Twitter is a business enterprise that employed 100 or more employees, excluding part-time employees, and/or employed 100 or more employees who in the aggregate work at 4,000 hours per week (exclusive of overtime) as defined in the WARN Act 29 U.S.C. §§2101(a)(1)(A) and (B).

118.   Respondent Twitter engaged in conducting mass layoffs, including laying off Claimant, but failed to provide Claimant with the required notice under the federal WARN Act.

WHEREFORE, Claimant demands that judgment be entered against Respondents, and seeks the following relief:

(a)   Compensatory damages;

(b)   Punitive damages;

(c)   Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d)   Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT VIII
### Violation of California & New York Warn Acts

119.   Claimant repeats and re-alleges the allegations as if specifically set forth herein.

120.    Claimant is entitled to the rights, protections, and benefits provided under the California WARN Act, Cal. Lab. Code §1400 *et seq.* and New York WARN Act, N.Y. Lab. Law §§ 860 *et seq.*

121.    Respondent Twitter was, and is, subject to the notice and back pay requirements of the California WARN Act because Respondent Twitter is a covered establishment that employed 75 or more employees as defined in the California WARN Act., Cal. Labor Code §1400(a).

122.    Respondent Twitter was, and is, subject to the notice and back pay requirements of the New York WARN Act because Respondent Twitter is a business enterprise that employed 50 or more employees as defined in the New York WARN ACT, N.Y. Lab. Law §§ 860 *et seq.*

123.    Respondent Twitter engaged in conducting mass layoffs, including laying off Claimant, but failed to provide Claimant with the required notice under the California and New York WARN Acts.

WHEREFORE, Claimant demands that judgment be entered against Respondents, and seeks the following relief:

(a)    Compensatory damages;

(b)    Punitive damages;

(c)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d)    Such other relief as may be deemed just and appropriate under the circumstances.

Dated: April 14, 2023                                        By: /s/ Bruce L. Atkins
                                                                              BRUCE L. ATKINS
                                                                              *Attorney for Claimant*

22