# EXHIBIT J

Case 2:23-cv-22908 Document 1 Filed 12/05/23 Page 1 of 23 PageID: 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALAN ROSA, | Civil Action No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| X CORP.; X HOLDINGS CORP.; ELON MUSK; STEVE DAVIS; JOHN DOES 1-10; and ABC CORPS. 1-10; | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, Alan Rosa ("Plaintiff"), by and through his attorneys Deutsch Atkins &

Kleinfeldt, P.C., by way of Complaint against Defendants X Corp.; X Holdings Corp. (collectively

"Twitter") Elon Musk, and Steve Davis ("Defendants") alleges the following:

### INTRODUCTION

1.       Plaintiff, a former employee of Twitter, Inc. ("Twitter")[1], which was rebranded as

X, brings this suit seeking legal and equitable relief against Defendants for (1) Breach of Contract

and Breach of Duty of Good faith and Fair Dealing; (2) unlawful termination in violation of the

New Jersey Conscientious Employee Protection Act, N.J.S.A. §34:19-1 *et seq.*; (3) common law

retaliation; (4) violations of New York Labor Law §740 and California Labor Code §1102.5; (5)

wrongful termination in violation of public policy; and (6) violations of the federal WARN Act,

---

[1] Around the time of the events set forth in the Complaint, Defendant X Corp., a wholly owned subsidiary of Defendant X Holdings Corp., became successor in interest to the company formerly known as Twitter, Inc., and assumed all of Twitter, Inc.'s debts and obligations. In April 2023, the company was rebranded as X. For clarity and consistency, this Complaint refers to Plaintiff's former employer as Twitter.

29 U.S.C. §§2101 *et seq.*, the California WARN Act, Cal. Lab. Code §1400 et seq. and New York WARN Act, N.Y. Lab. Law §§ 860 *et seq.*

2.      In connection with Plaintiff's employment at Twitter, Plaintiff signed and entered into a Dispute Resolution Agreement ("Arbitration Agreement") with Twitter.

3.      The Arbitration Agreement requires that claims for arbitration be brought before Judicial Arbitration and Mediation Services ("JAMS"), an alternative dispute resolution provider, pursuant to the then-current JAMS rules.

4.      On April 14, 2023, Plaintiff filed a Demand for Arbitration against Defendants. An arbitrator was appointed to his case and Plaintiff paid his portion of the filing fee.

5.      Pursuant to the JAMS employment Minimum Standards, an employee who brings an arbitration case at JAMS must pay an initial filing fee and all other arbitration fees, including fees to pay the arbitrator, must be borne by the employer.

6.      JAMS determined that the employment Minimum Standards apply under the JAMS rule and further determined that Twitter was responsible for all the arbitration fees with the exception of Claimant's portion of the filing fee.

7.      To date, Twitter has refused to pay its portion of the arbitration fees despite being ordered by JAMS to do so.

8.      JAMS has further advised Twitter that after the initial deposits are paid, Twitter can raise the issue regarding fees with arbitrator. Yet, Twitter has still failed to pay its required initial deposit.

9.      On August 21, 2023, September 20, 203, and December 4, 20023, JAMS advised the parties that if the fee is not paid, the file will be closed.

10.     Defendants never responded to these emails and never paid their portion of the arbitration fee.

2

11.     When a party fails to advance required fees for an arbitration to commence it is considered an obstruction of the arbitration process, which disentitles said party from enforcing an arbitration clause in a contract. Heisman v. Wyndham Vacation Resorts, Inc., 2021 U.S. Dist. LEXIS 55369, *10 (D.N.J. Mar. 22, 2021) (internal citations omitted).

12.     As a result of Defendants' obstruction of the arbitration process, the Plaintiff was forced to file this Complaint.

## PARTIES

13.     Plaintiff, a citizen of New Jersey, was an employee of Twitter from January 24, 2022 until he was unlawfully terminated on December 6, 2022.  Plaintiff was Head of Global Information Technology and Information Security and worked remotely for Twitter performing the majority of his job duties from his home in New Jersey.  However, at times, he worked out of the New York office and California office.

14.     Defendant X Corp. ("Defendant X Corp." and/or "X Corp.") is a Nevada corporation and the successor to Twitter, Inc.

15.     Twitter, Inc. merged into Defendant X Corp. in or around March 2023, and as a result, Twitter, Inc. and X Corp. are a single entity.  X Corp. succeeded all of Twitter, Inc.'s obligations upon the merger, including liability for the unlawful acts of Twitter, Inc.

16.     Upon information and belief, Defendant X Corp. has headquarters at Twitter's former headquarters and principal place of business at 1355 Market Street #900, San Francisco, California 94103 and maintains Twitter's former New York office at 249 W. 17th Street, New York, NY 10011.

17.     Defendant X Holdings Corp. is a Nevada corporation, and is the parent corporation of Defendant X Corp.

3

18.     Defendant Elon Musk ("Musk") assumed ownership of Twitter and served as Chief Executive Officer at Twitter at all times relevant to the pleadings.

19.     Defendant Steve Davis ("Davis") was a high-level advisor at Twitter at all times relevant to the pleadings.

20.     Defendants, John and Jane Does 1-10, currently unidentified, are individuals who, on the basis of the direct acts or on the basis of *respondeat superior,* are answerable to the Plaintiff or the acts set forth herein, and/or are currently unknown employees, Officers, or Board members who were either senior management level employees or Officers who controlled Plaintiff's workplace, and supervised Plaintiff and aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment or Offices at the workplace during working hours, or, to the extent they went beyond the scope of their employment or Offices, Defendants ratified, embraced and added to their conduct.

21.     Defendants, ABC Corporations 1-10, currently unidentified, are unknown entities who, on the basis of the direct acts or on the basis of *respondeat superior* and/or are unknown affiliated corporations or entities or other corporations who have liability for the claims set forth herein.

## JURISDICTION & VENUE

22.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 29 U.S.C. §§2101 *et seq*.  This court has jurisdiction over this matter under 28 U.S.C. § 1332.

23.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is a complete diversity of citizenship between the parties hereto and the amount in controversy exceeds $75,000.

24.    The Court has personal jurisdiction over Defendants because it regularly engages and conducts business in New Jersey.

25.    Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and damages to Plaintiff occurred in this District as a result of Defendants' conduct as alleged below.

## FACTUAL ALLEGATIONS

26.    Twitter is a social media company that employs thousands of individuals across the United States.

27.    Plaintiff commenced employment at Twitter on January 24, 2022, as Head of Global Information Technology and Information Security.

28.    Plaintiff was responsible for the Global Information Technology and Information Security organization (500 Tweeps) across all Twitter businesses headquartered in San Francisco with sites across the United States.

29.    Plaintiff entered into an employment agreement that Twitter provided to him on or around December 13, 2022.

30.    The employment agreement provided compensation terms. In addition to Plaintiff's base compensation, the Company agreed to pay Equity Compensation to Plaintiff as follows:

> **Equity Compensation**. Subject to the approval of the Compensation Committee of the Company's Board of Directors (or an authorized subcommittee), you will be granted a specified number of restricted stock units of the Company ('RSUs'). The number of RSUs that are granted to you, if approved, will be determined by dividing $5,000,000.00 USD by the prevailing RSU conversion rate in effect during the month in which your employment role commences under the terms of this offer letter, rounded up to the nearest whole share. (Note: for the purposes of the RSU grant under this paragraph, your employment commencement date is anticipated to be your Start Date as set out above, unless delayed or deferred for any reason. In the event you have been previously engaged by the Company in

any capacity under a different role or arrangement, such prior service will not count for the purposes of your RSU grant). The RSUs will be subject to the terms of the Company's 2013 Equity Incentive Plan and its form of RSU agreement (the 'Equity Documents'). You will vest in 12.5% of the RSUs on the six month anniversary of the first day of the month following your Start Date, provided you have continued to provide services to the Company until that date, and over your next three and a half years of continuous service with the Company you will vest 6.25% per quarter, as will be further described in the Equity Documents. Be advised that the calculation used to determine the number of RSUs granted is determined in the sole discretion of the Company and will not correlate to any published stock price on your date of hire and, furthermore, does not denote, nor can it predict, the future value of any RSUs. Stock prices are by nature volatile, and there is no way to predict the value of your future shares, if and when they vest. Subject to your continued employment in an equity eligible role, you will be eligible to receive future equity grants.

31.     Per the employment agreement, Twitter issued Restricted Stock Units ("RSUs"), which represent full-value shares, to Plaintiff, subject to the vesting plan and distribution schedule.

32.     Per the employment agreement, 12.5% of the RSUs that were issued to Plaintiff vest on the first day of the month following the Plaintiff's six-month anniversary of his Company start date.

33.     Thereafter, per the employment agreement, 6.25% of the RSUs that were issued to Plaintiff vest per quarter over the next three and half years.

34.     On or about August 1, 2022, 12.5% of the RSUs that were issued to Plaintiff vested, and the Plaintiff was paid per the vesting plan and distribution schedule.

35.     In November/December 2022, Plaintiff had approximately 5.82 million in remaining shares, which were expected to vest over the next three years, with the first vesting on February 1, 2023, in the amount of $363,878.43.

36.     In addition to Plaintiff's base compensation and Equity Compensation, per the employment agreement, the Company agreed to pay the Plaintiff a performance bonus award as follows:

6

> **Performance Bonus Plan**. You may be eligible to earn a discretionary performance bonus award in accordance with the Company's discretionary Performance Bonus Plan as it may exist and/or be amended from time to time. For the current Performance Bonus Plan year, the Performance Bonus Plan target for your position is 40% of annual eligible earnings, paid pursuant to the terms and conditions in the Performance Bonus Plan.

37.    Plaintiff was expected to receive his 2022 earned performance bonus award in the amount of $200,000 in February 2023.

38.    On or around October 28, 2022, Musk, a multi-billionaire, purchased the Company and assumed ownership.

39.    Immediately thereafter, on or around November 1, 2022, Elon Musk began laying off half of the Company's workforce.

40.    Prior to Musk's purchase, the FTC charged Twitter with violating the 2011 FTC Order, by collecting users' personal information for the stated purpose of security and then exploiting it commercially. Twitter paid a $150 million-dollar civil penalty and entered into a new consent order on May 26, 2022 ("Twitter FTC Consent Decree").

41.    The Twitter FTC Consent Decree required Twitter to establish, implement, and maintain a comprehensive privacy and information security program, including substantial new compliance measures to prevent further misleading tactics that threatened the potential privacy and security of confidential user information.

42.    Musk was consistently dismissive of the Twitter FTC Consent Decree and Twitter's obligations under it.

43.    On or around November 2, 2022, Twitter notified Plaintiff that he had been selected to run the IT, Security, and Privacy teams.

44.     Shortly after assuming ownership, Musk hired Davis to serve as a high-level advisor at Twitter giving Davis authority to direct Plaintiff's work activities and/or undertake tangible employment decisions affecting the Plaintiff.

45.     Davis, like Musk, was dismissive of the Twitter FTC Consent Decree and began cutting Twitter's products and services that supported and complied with the Twitter FTC Consent Decree.

46.     For example, Davis did not want to pay for vulnerability management software and he resisted paying for the Company's ethical hacking program called "HackerOne". Both programs were necessary for Twitter to comply with the Twitter FTC Consent Decree.

47.     Plaintiff objected to these cuts as he had a reasonable belief that cutting these programs would prevent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

48.     On or around November 21, 2022, Davis directed Plaintiff to shut down Salesforce, which is legal case software that enables Twitter to share details with law enforcement entities around the world regarding time-sensitive and important legal matters.

49.     Plaintiff objected to the direction to shut down Salesforce due to the dependency between the Legal Case Review platform and Salesforce as the immediate shutdown would violate the Digital Service Act's ("DSA") legal requirements and jurisdictional rules around the globe by compromising Twitter's inability to properly handle law enforcement inquiries.

50.     Plaintiff disclosed his objection to Jim Baker, Deputy General Counsel and Vice President, Legal, Twitter, Inc., and reiterated the difficulties and consequences of recklessly turning off the solution without an alternative, as Twitter would be violating the DSA and jurisdictional rules around the globe because the Company would be unable to respond to law enforcement inquiries if Salesforce was abruptly shut down.

51.     On or around the evening of December 1, 2022, Davis directed Plaintiff to cut the physical security budget by an additional 50% by midnight. This was done in hours, not days.

52.     Plaintiff immediately objected to participating in such activity, as he had a reasonable belief that such an immediate budget cut, after already cutting the budget by 50%, would put the physical building at risk of violating a Court Order (explained *infra* at ¶31) and it posed a substantial danger to public safety.

53.     The physical building, whose security he had to immediately cut, stored over 800 laptops and other electronic devices that were subject to litigation holds, per Court Orders, which required the Company to ensure that the physical data on the laptops and other electronic devices in the building were preserved and were not removed, destroyed, or altered in any way.

54.     Plaintiff had a reasonable belief that quickly cutting the physical budget again, within hours, without new security measures in place would violate the litigation holds, per the Court Orders, as there would be no way to preserve the physical laptops and other electronic devices to ensure that they were not altered in any way.

55.     Plaintiff also had a reasonable belief that cutting the physical budget again, without new security measures in place, posed a substantial and specific danger to public health and/or safety because there were numerous protestors at the physical building location.

56.     A few hours following Plaintiff's objection, Davis called Plaintiff, advised him that he was removing Plaintiff's oversight of the physical security team, and abruptly hung up the phone on Plaintiff.

57.     Five days later, on December 6, 2022, Twitter revoked Plaintiff's Company access, without notice, effectively removing Plaintiff from the Company and terminating his employment.

58.     Twitter provided no reason for Plaintiff's termination.

59.    Plaintiff was terminated in retaliation for objecting to the activities of Defendants that the Plaintiff reasonably believed to be unlawful.

60.    Twitter advised Plaintiff, after his termination, that he would receive a severance package, his February 1st vesting compensation, bonus compensation, and two months of paid COBRA benefits, as this was being provided to all other laid-off Company employees.

61.    Thereafter on December 16, 2022, Twitter advised Plaintiff that his severance paperwork and severance package was being put on hold pending an investigation regarding his conduct during his employment.

62.    Plaintiff was never advised as to the nature of, nor the outcome of the investigation, nor was he interviewed regarding same, despite his many inquiries to the Company.

63.    The purported investigation into Plaintiff's conduct was a sham investigation, conducted in an attempt to deprive Plaintiff of his severance package, his February 1st vesting compensation, bonus compensation, and two months of paid COBRA benefits that were being provided to all other terminated Company employees.

64.    Further, Twitter refused to reimburse Plaintiff for his then-existing legitimate business expenses in the amount of $4,800, in violation of Company policy.

65.    Plaintiff's termination was a deliberately timed, bad faith effort to deprive Plaintiff of his equity compensation and performance bonus as set forth in his employment agreement.

66.    New Jersey law does not permit the actions of firing an employee in order to avoid paying equity compensation or bonus compensation:

> The New Jersey Supreme Court has held that there is an implied covenant of good faith and fair dealing in every contract. *Onderdonk v. Presbyterian Homes of N.J.,* 85 N.J. 171, 182 (1981); *Bak-A-Lum v. Alcoa Bldg. Prod.,* 69 N.J. 123, 129-30, (1976); *Association Group Life, Inc. v. Catholic War Veterans of U.S.,* 61 N.J. 150, (1972); *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, (1965). As a corollary to that proposition, the

Court commented that ***it is reasonable to imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement.*** *Onderdonk,* 85 N.J. at 182 (citations omitted). ***A cognizable cause of action for breach of the implied duty of good faith and fair dealing in the employment context exists where the employer attempts to deprive the employee of the benefits of the employment agreement without an honest belief that good cause for discharge is in fact present.*** *See Noye v. Hoffmann- La Roche, Inc.,* 238 N.J. Super. 430,570 A.2d 12 (App. Div. 1990), *certif. denied,* 122 N.J. 146 (1990); *see also Nolan v. Control Data Corp.,* 243 N.J. Super. 420,579 A.2d 1252 (App. Div. 1990).

In the absence of a contract, there is no implied covenant of good faith and fair dealing under New Jersey law. *See Noye,* 238 N.J. Super. at 433. ***However, an implied obligation of good faith is applicable to those aspects of the employer-employee relationship which are governed by some contractual terms, even if the employment is characterized as being "at- will."*** *Nolan,* 243 N.J. Super. at 429.

*King v. Port Auth,* 909 F. Supp. 938, 941-42 (D.N.J.***1995) (emphasis added),*** see also *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130 (1965)("neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words in every contract there exists an implied covenant of good faith and fair dealing").

67.    Plaintiff was terminated approximately one month before he was to receive his bonus compensation in the amount of $200,000 and his February 1, 2023 vested equity compensation in the amount of $363,878.43.  The termination of Plaintiff was a deliberate effort by Defendants to deprive Plaintiff of his bonus compensation and equity compensation in the total amount of 5.8 million shares owed to Plaintiff and divert it to Twitter.

68.    Punitive damages are available where executive-level employees of a Company deprive an employee of the benefits of a contract, as the company will be vicariously liable for the malicious actions of its executives/employees. *Cappiello v. Ragen Precision Industries, Inc.,* 192 N.J.Super. 523, 531-32 (App. Div. 1984).

69.     At all times Plaintiff's job performance was beyond satisfactory.

70.     Plaintiff was terminated in an unexplainable fashion as he did nothing wrong that would justify his termination.  No reason was provided to Plaintiff explaining why he was being fired.

71.     The New Jersey Conscientious Employee Protection Act, <u>N.J.S.A.</u> 34:19-1, *et seq.* ("CEPA"), the New York Labor Law Section §740, and the California Labor Code §1102.5 make it illegal for an employee to take any adverse employment action against an employee because the employee objects to any activity that the employee <u>reasonably believes</u> to be in violation of a law, rule, or regulation, including any violation involving the deception of or misrepresentation to a client or a governmental entity.  <u>See also,</u> <u>N.J.S.A.</u> 34:19-3(c).  As recognized by the New Jersey Supreme Court:

> The purpose of CEPA is to protect employees who report illegal or unethical work-place activities. So viewed, CEPA is remedial legislation. Consequently, courts should construe CEPA liberally to achieve its remedial purpose. Stated differently, CEPA is supposed to encourage, not thwart, legitimate employee complaints.
>
> *Estate of Roach v. TRW, Inc.*, 164 N.J. 598, 609-610 (2000)(citations omitted)

72.     CEPA permits the recovery of the full spectrum of tort-related damages, including back pay, front pay (lost future wages), emotional distress, reinstatement, and punitive damages. <u>See</u> <u>N.J.S.A.</u> 34:19-5.  Additionally, prevailing plaintiffs may recover attorneys' fees and costs pursuant to the law's fee-shifting provisions.

73.     Plaintiff was terminated in retaliation for objecting to the activities of Defendants that the Plaintiff reasonably believed to be unlawful.

74.     Plaintiff is entitled to lost income, emotional distress damages, and punitive damages.

## COUNT I
### Breach of Contract
### Breach of Duty of Good Faith and Fair Dealing

75.     Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

76.     Twitter and Plaintiff agreed to certain terms and conditions of employment, specifically as it related to compensation.

77.     The agreement between Plaintiff and Twitter contained an implied covenant of good faith and fair dealing, which obligated Twitter to perform the terms and conditions of the agreement fairly and in good faith to ensure Plaintiff received the benefits to which he was entitled to, that the parties had agreed to, and to refrain from doing any act in a bad faith manner that would deprive Plaintiff of the benefits of their agreement.

78.     Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the employment agreement.

79.     Twitter terminated Plaintiff less than two months before he was to receive his bonus compensation and his February 1, 2023, vesting deliberately to deprive Plaintiff of the benefits of his bonus and equity compensation, 5.82 million in shares, which were expected to vest over the next three years, that the parties had agreed to, without an honest belief that good cause for discharging Plaintiff was present.

80.     Although Twitter advised Plaintiff that he would receive his severance package, his February 1st vesting, bonus, and two months of paid COBRA benefits, as was being provided to all other laid-off Company employees, Twitter never provided it, claiming that it was on hold pending an investigation regarding his conduct during his employment.

81.     The purported investigation into Plaintiff's conduct was a sham investigation, in an attempt to deprive him of his severance package, his February 1st vesting, bonus, and two months of paid COBRA as the results or reasons for said investigation were never disclosed to him.

13

82. Further, Twitter failed to reimburse Plaintiff for his legitimate work expense report in the amount of $4,800, which is due and owing.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, and seeks the following relief:

(a) Compensatory damages;

(b) Punitive damages;

(c) Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d) Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT II
### Unlawful Termination, New Jersey Conscientious Employee Protection Act
### N.J.S.A. §34:19-1 *et seq.*

83. Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

84. Twitter, Inc. is an "employer" within the meaning of N.J.S.A. §34:19-2(a).

85. Defendant Elon Musk is an "employer" and a "supervisor" within the meaning of N.J.S.A. §34:19-2(a) and (d).

86. Defendant Steve Davis is an "employer" and a "supervisor" within the meaning of N.J.S.A. §34:19-2(a) and (d).

87. The actions of Defendants were in direct violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. §34:19-1 *et seq.*

88. Plaintiff objected to cutting Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

14

89.     Plaintiff reasonably believed that the immediate shutdown of Salesforce was a violation of a law, rule, or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

90.     Plaintiff reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would violate a law, rule, or regulation because the Company would be violating litigation holds, per Court Orders.  As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

91.     Plaintiff objected to the conduct and activities of Defendants that Plaintiff reasonably believed to be unlawful.

92.     Plaintiff was discharged from employment because he objected to the conduct and activities that Plaintiff reasonably believed to be unlawful.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, and ABC Corporations 1-10, and seeks the following relief:

(a)     Compensatory damages;

(b)     Emotional distress damages;

(c)     Punitive damages;

(d)     Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(e)     Such other relief as may be deemed just and appropriate under the circumstances.

15

## COUNT III
## Common Law Retaliation in Violation of
## Pierce v. Ortho Pharmaceutical Group, 84 N.J. 58, (1980)

93.     Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

94.     Plaintiff was terminated for declining to perform an act or acts, objecting to and/or complaining about an act or acts that he believed to be a violation of the law, rules, regulations, and/or public policy.

95.     A causal connection exists between Plaintiff's termination and his whistleblowing activities.

96.     Defendants acted maliciously and willfully in creating a pretextual sham investigation regarding Plaintiff's conduct.

97.     The actions of Defendant's terminating Plaintiff were contrary to the public policies of New Jersey and have caused Plaintiff to suffer damages.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, and seeks the following relief:

      (a)    Compensatory damages;

      (b)    Emotional distress damages;

      (c)    Punitive damages;

      (d)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

      (e)    Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT IV
## Violation of New York Labor Law §740

98.     Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

99.     Plaintiff was an "employee" of Twitter pursuant to NY Labor Law §740(1)(a).

100.    Twitter is an "employer" within the meaning of NY Labor Law §740(1)(b).

101.    Defendant Elon Musk is an "employer" and a "supervisor" within the meaning of NY Labor Law §740(1)(b) and (1)(f).

102.    Defendant Steve Davis is an "employer" and a "supervisor" within the meaning of NY Labor Law §740(1)(b) and (1)(f).

103.    The actions of Defendants were in direct violation of the NY Labor Law §740.

104.    Plaintiff objected to cutting Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

105.    Plaintiff reasonably believed that the immediate shutdown of Salesforce was a violation of a law, rule, or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

106.    Plaintiff reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would violate a law, rule, or regulation because the Company would be violating litigation holds, per the Court Orders.  As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

107.    Plaintiff also had a reasonable belief that cutting the physical budget again, without new security measures in place posed a substantial and specific danger to the public health and/or safety because there were numerous protestors at the physical building location.

108.    Plaintiff objected to, and/or refused to participate in any such activity, policy, or practice.

109.    Plaintiff was proximately terminated from his employment with Twitter because he objected to, and/or refused to participate in any such activity, policy, or practice.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, and ABC Corporations 1-10 and seeks the following relief:

   (a)    Compensatory damages;

   (b)    Emotional distress damages;

   (c)    Punitive damages;

   (d)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

   (e)    Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT V
### Retaliation in Violation of California Labor Code §1102.5

110.    Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

111.    At all times herein, California Labor Code §1102.5 was in effect and binding on Defendants.  This section requires Defendants to refrain from retaliating against an employee for refusing to participate in an activity that he reasonably believes would result in a violation of state or federal statute, or a violation of or noncompliance with a state or federal rule or regulation.

112.    At all times relevant, Twitter, Inc. was Plaintiff's "employer" for the purposes of California Labor Code §1102.5.

113.    Defendant Elon Musk was an "employer" and/or a "person acting on behalf of the employer" for the purposes of California Labor Code §1102.5.

114.    Defendant Steve Davis was an "employer" and a "person acting on behalf of the employer" for the purposes of California Labor Code §1102.5.

115.    Plaintiff objected to cutting Twitter's products and services that supported and complied with the Twitter FTC Consent Decree as he had a reasonable belief that cutting these programs would prevent Twitter from complying with its obligations under the Twitter FTC Consent Decree Order.

116.    Plaintiff reasonably believed that the immediate shutdown of Salesforce would result in a violation of state or federal statute, or a violation of or noncompliance with a state or federal rule or regulation because the Company would be unable to respond to law enforcement inquiries in violation of the DSA's legal requirements and jurisdictional rules around the globe.

117.    Plaintiff reasonably believed that immediately cutting the physical budget by an additional 50% in a couple of hours, resulting in more layoffs, without new security measures in place, would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, because the Company would be violating litigation holds, per the Court Orders.  As such, there would be no way to preserve the 800 plus physical laptops and other electronic devices subject to the litigation holds, that were stored at that physical location to ensure that they were preserved and were not removed, destroyed, or altered in any way.

118.    Plaintiff also had a reasonable belief that cutting the physical budget again, without new security measures in place would result in a violation of state or federal statute, or a violation

19

of or noncompliance with a local, state, or federal rule or regulation because it posed a substantial and specific danger to the public health and/or safety as there were numerous protestors at the physical building location.

119.    Plaintiff objected to and refused to participate in such activities that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

120.    Defendants retaliated against Plaintiff for objecting to and refusing to participate in such activities by terminating his employment with the Company.

121.    As a direct and proximate result of such retaliation, Plaintiff has experienced damages, including loss of salary, bonus, equity compensation, benefits, and emotional distress.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants X Corp., X Holdings Corp., Musk, Davis, John and Jane Does 1-10, ABC Corporations 1-10, and seeks the following relief:

(a)    Compensatory damages;

(b)    Emotional distress damages;

(c)    Punitive damages;

(d)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(e)    Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT VI
## Wrongful Termination in Violation of Public Policy

122.    Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

123.    At all times referenced in this Demand for Arbitration, California Labor Code Section §1102.5 was in full force and effect and was binding on Defendants. This law requires

Defendants to refrain, among other things, from retaliating against employees who refuse to participate in or condone conduct they reasonably believe to violate state or federal law.

124.    Plaintiff was terminated for declining to perform an act or acts, objecting to and/or complaining about an act or acts that he believed to be a violation of the law, rules, regulations and/or public policy.

125.    A causal connection exists between Plaintiff's termination and his whistleblowing activities.

126.    Defendants acted maliciously and willfully in creating a pretextual sham investigation regarding Plaintiff's conduct.

127.    The actions of Defendants in terminating Plaintiff were contrary to the public policies of California and have caused Plaintiff to suffer damages.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, and seeks the following relief:

      (a)    Compensatory damages;

      (b)    Punitive damages;

      (c)    Attorneys' fees, pre- and post-judgment interest, and costs of suit;

      (d)    Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT VII
### Violation of Federal Warn Act
### 29 U.S.C. §§2101 *et seq.*

128.    Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

129.    Plaintiff is entitled to the rights, protections, and benefits provided under the federal WARN Act, 29 U.S.C. §§2101 et *seq.*

130.     Twitter was, and is, subject to the notice and back pay requirements of the federal WARN Act because Twitter is a business enterprise that employed 100 or more employees, excluding part-time employees, and/or employed 100 or more employees who in the aggregate work at 4,000 hours per week (exclusive of overtime) as defined in the WARN Act 29 U.S.C. §§2101(a)(1)(A) and (B).

131.     Twitter engaged in conducting mass layoffs, including laying off Plaintiff, but failed to provide Plaintiff with the required notice under the federal WARN Act.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, and seeks the following relief:

(a)     Compensatory damages;

(b)     Punitive damages;

(c)     Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d)     Such other relief as may be deemed just and appropriate under the circumstances.

## COUNT VIII
## Violation of California & New York Warn Acts

132.     Plaintiff repeats and re-alleges the allegations as if specifically set forth herein.

133.     Plaintiff is entitled to the rights, protections, and benefits provided under the California WARN Act, Cal. Lab. Code §1400 *et seq.* and New York WARN Act, N.Y. Lab. Law §§ 860 *et seq.*

134.     Twitter was, and is, subject to the notice and back pay requirements of the California WARN Act because Twitter is a covered establishment that employed 75 or more employees as defined in the California WARN Act., Cal. Labor Code §1400(a).

135.     Twitter was, and is, subject to the notice and back pay requirements of the New York WARN Act because Twitter is a business enterprise that employed 50 or more employees as defined in the New York WARN ACT, N.Y. Lab. Law §§ 860 *et seq.*

136.     Twitter engaged in conducting mass layoffs, including laying off Plaintiff, but failed to provide Plaintiff with the required notice under the California and New York WARN Acts.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, and seeks the following relief:

(a)     Compensatory damages;

(b)     Punitive damages;

(c)     Attorneys' fees, pre- and post-judgment interest, and costs of suit;

(d)     Such other relief as may be deemed just and appropriate under the circumstances.

Respectfully submitted,

Dated: December 5, 2023

*/s/ Bruce L. Atkins*
BRUCE L. ATKINS, ESQ.
DEUTSCH ATKINS & KLEINFELDT, P.C.
*Counsel for Plaintiff, Alan Rosa*
batkins@deutschatkins.com