**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALAN ROSA, | |
| Plaintiff, | |
| v. | Case No. 2:23-cv-22908 (BRM) (AME) |
| X CORP.; X HOLDINGS CORP.; ELON MUSK; STEVE DAVIS; JOHN DOES 1-10; and ABC CORPS. 1-10; | **OPINION** |
| Defendants. | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendants[1] Elon Musk ("Musk") and Steve Davis's ("Davis") (collectively, the "Executives") Motion to Dismiss Plaintiff Alan Rosa's ("Rosa") Complaint (ECF No. 2),[2] pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, Federal Rule of Civil Procedure 12(b)(6) (ECF No. 8). Also before this Court is Defendants X Corp. and X Holdings Corp.'s (collectively, "Twitter") (together with the Executives, "Defendants") Motion to Compel Arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). (ECF No. 9.) Rosa filed Oppositions to both Motions. (ECF Nos. 12, 13.) Both the Executives and Twitter filed Replies to the Opposition to their respective Motions. (ECF Nos. 16, 17.) Having

---

[1] Rosa has also named John Does 1-10 and ABC Corps. 1-10 in his Complaint. Named Defendants' briefings do not purport to speak for the John Does or ABC Corps. named in this matter. (ECF No. 2.) Because these parties have not appeared or been identified, this Opinion does not determine whether Rosa is entitled to relief against them.

[2] Rosa originally filed his complaint as an "Amended Complaint." (ECF No 1.) The Clerk's Office notified him of this mistake, and the proper Complaint (ECF No. 2) was subsequently filed.

reviewed the submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, the Executives' Motion to Dismiss Rosa's Complaint (ECF No. 8) is **GRANTED** and Twitter's Motion to Compel Arbitration (ECF No. 9) is **GRANTED.**

## I.    BACKGROUND

For the purposes of these motions to dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Rosa. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court may also consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

This action involves an employment dispute pertaining to an alleged breach of Plaintiff's employment contract due to unlawful termination and retaliation in violation of common law, the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1 *et seq.* ("NJCEA"), and New York Labor Law § 740 and California Labor code § 1102.5. (*See generally* ECF No. 2.) Rosa is a former employee of Twitter, Inc., which was rebranded as X. (*Id.* at 1.) X Corp. is a Nevada corporation and the direct successor to Twitter, Inc., resulting from the companies' merger in or around March 2023 with X Corp., wherein X Corp. assumed all obligations of Twitter, Inc. (*Id.* at 3.) X Holdings Corp. is a Nevada corporation and the parent company of X Corp. (*Id.*) Musk assumed ownership of Twitter and is Chief Executive Officer of the company. (*Id.* at 4.) Davis was a "high-level advisor at Twitter," who supervised Plaintiff in part. (*Id.*)

Rosa states he was fired from Twitter after he objected to various budget cuts and program decisions by Davis and/or Musk when he believed those actions were in violation of the May 26,

2022 Federal Trade Commission ("FTC") Consent Decree. (*Id.* at 7–9.) He alleges he was fired purposefully, in bad faith, and in retaliation to his objections, so that Defendants could avoid paying him his equity compensation and performance bonus as required in his employment agreement. (*Id.* at 10, 12.) Further, Rosa claims an investigation into his workplace conduct post-termination was a sham and only done to prevent his severance package from being provided, especially because no details or results of the investigation were given to him. (*Id.*) He states "[a]t all times [his] job performance was beyond satisfactory" and no explanation as to why he was fired was ever provided. (*Id.* at 12.)

On April 14, 2023, Rosa filed a Demand for Arbitration against Defendants, and an arbitrator was appointed to his case from the Judicial Arbitration and Mediation Services ("JAMS"). (*Id.* at 2.) Rosa paid the initial filing fee to JAMS, but nothing further. (*Id.*) JAMS determined that the Employment Minimum Standards applied, which meant Twitter was responsible for all arbitration fees except for Rosa's portion of the filing fee. (*Id.*) Rosa claims that Twitter refused to pay "its portion of the arbitration fees despite being ordered by JAMS to do so." (*Id.*) Twitter has maintained it refused to pay because it is against the explicit terms of its arbitration agreement with Rosa and, per its interpretation of the fee-arrangement provision, it is not willing to pay more than half of the required arbitral fees. (ECF No. 9 at 4.) Rosa does not agree with this interpretation, instead relying on a different provision of the contract, which incorporated the JAMS Rules into the Dispute Resolution Agreement ("DRA"). (ECF No. 13 at 4–6). Given this disagreement, the JAMS case coordinator told Twitter "[i]t has been determined that the Employment Minimum Standards apply in this matter," therefore the employer had to cover all fees up front. (ECF No. 9 at 4.) Twitter continued to refuse to pay more than the half of the fees despite Rosa's counsel's and JAMS employees' attempts to have Twitter pay initially and then

have "any disputes in this regard . . . resolved by the Arbitrator" or later have Twitter "make an application for costs and fees to the arbitrator for consideration." (*Id.* at 4–5.) Both Rosa and Defendants were notified on August 21, 2023 and September 20, 2023 that, without the initial retainer being paid, JAMS will administratively close the file. (ECF Nos. 9-3, 13-10.) JAMS subsequently followed up with the parties on October 23, 2023 and December 4, 2023, before Rosa's counsel notified JAMS on December 18, 2023 that "[g]iven Respondents' failure to pay pursuant to JAMS rules, we filed a complaint in federal court on behalf of Mr. Rosa." (ECF Nos. 2 at 2, 9-3, 13-10.)

Rosa filed his Complaint on December 6, 2023. The Complaint alleges the following causes of action: (1) Breach of Contract and Breach of Duty of Good Faith and Fair Dealing (Count I); (2) unlawful termination in violation of the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1, *et seq.* ("NJCEA") (Count II); (3) common law retaliation in violation of *Pierce v. Ortho Pharmaceutical Group*, 417 A.2d 505 (N.J. 1980) (Count III); (4) violation of New York Labor Law § 740 (Count IV); (5) retaliation in violation of California Labor code § 1102.5 (Count V); (6) wrongful termination in violation of public policy (Count VI); (7) violation of Federal WARN Act 29 U.S.C. §§ 2101, *et seq.* (Count VII); and (8) violation of California WARN Act, Cal. Lab. Code §1400, *et seq.* and New York WARN Act, N.Y. Lab. Law §§ 860, *et seq.* (Count VIII).[3]

On March 22, 2024, the Executives filed their Motion to Dismiss Rosa's Complaint pursuant to Rule 12(b)(2), or, in the alternative, 12(b)(6). (ECF No. 8.) On the same day, Twitter filed its Motion to Compel Arbitration. (ECF No. 9.) On April 22, 2024, Rosa filed his respective

---

[3] In Rosa's Opposition to the Motion to Dismiss, he withdrew his claims against the Executives under Counts VII and VIII. (ECF No. 12.)

Oppositions to each Motion. (ECF Nos. 12, 13.) On May 13, 2024, the Executives filed their Reply to Rosa's Opposition to their Motion to Dismiss (ECF No. 16), and Twitter filed its Reply to Rosa's Opposition to its Motion to Compel Arbitration (ECF No. 17).

## II.   LEGAL STANDARD

### A.   Personal Jurisdiction

A plaintiff bears "the burden of demonstrating facts that establish[] personal jurisdiction." *Fatouros v. Lambrakis*, 627 F. App'x 84, 86-87 (3d Cir. 2015) (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)). "In reviewing a motion to dismiss for lack of personal jurisdiction, a court 'must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.'" *Smith v. Zimmer US, Inc.*, Civ. A. No. 19-06863, 2020 WL 487029, at *1 (D.N.J. Jan. 29, 2020) (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)). "But when a defendant raises a jurisdictional defense, 'a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper.'" *Id.* (quoting *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996)). In determining whether it has personal jurisdiction, the Court is not bound by the pleadings, *see id.*, and, to the extent they are material, will include relevant allegations pertaining to jurisdiction in its summary of the facts, while construing all disputed facts in favor of the plaintiff. *Carteret Sav. Bank*, 954 F.2d at 142 n.1.

Pursuant to Federal Rule of Civil Procedure 4(k), a federal district court may exercise personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which it sits. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). New Jersey's long-arm statute permits the exercise of personal jurisdiction over non-resident defendants to the fullest extent as allowed under the Fourteenth Amendment of the United States

Constitution. N.J. Ct. R. 4:4-4; *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 796 (D.N.J. 1996). In other words, this Court's jurisdiction is "constrained, under New Jersey's long-arm rule, only by the 'traditional notions of fair play and substantial justice,' inhering in the Due Process Clause of the Constitution." *Carteret Sav. Bank*, 954 F.2d at 145 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Thus, parties who have constitutionally sufficient 'minimum contacts' with New Jersey are subject to suit there." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing *Carteret Sav. Bank*, 954 F.2d at 149).

The Supreme Court has defined two categories of personal jurisdiction: general jurisdiction and specific jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). General jurisdiction requires continuous and systematic contacts and exists in "situations where a foreign corporation's 'continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" *Id.* (alteration in original) (quoting *Int'l Shoe Co.*, 326 U.S. at 318). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliation with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Int'l Shoe Co.*, 326 U.S. at 317. While the Supreme Court has not ruled out the possibility an individual could be subject to general jurisdiction because of "continuous and systematic contacts" with the forum, the Court has applied general jurisdiction only to corporate defendants. *Goodyear Dunlop Tires Ops.*, 564 U.S. at 924 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; *for a corporation*, it is an equivalent place, *one in which the corporation is fairly regarded as at home*." (emphasis added)). "It may be that whatever special rule exists permitting 'continuous and

systematic' contacts . . . to support jurisdiction with respect to matters unrelated to activity in the forum applies only to corporations." *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604, 610 n.1 (1990) (citations omitted).

Specific jurisdiction, however, may be established over a defendant who "has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (citations omitted). More specifically, specific jurisdiction requires: "(1) the defendant purposefully directed its activities at the residents of the forum, (2) the claim arises out of or relates to those activities, and (3) the assertion of personal jurisdiction is reasonable and fair." *WAG Acquisition, LLC v. Multi-Media, LLC*, Civ. A. No. 14-01661, 2015 WL 5310203, at *12 (D.N.J. Sept. 10, 2015) (citation omitted); *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) (stating "what is necessary [for specific jurisdiction] is a deliberate targeting of the forum" (citation omitted)).

A court's exercise of personal jurisdiction "requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Additionally, due process requires that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co.*, 326 U.S. at 316); *see also O'Connor*, 496 F.3d at 316–23 (discussing the three-step process to determine personal jurisdiction). Importantly, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

297 (1980). "[T]he state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants." *Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007). Rather, "[j]urisdiction is proper when the state of a plaintiff's residence is 'the focus of the activities of the defendant out of which the suit arises.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)).

Moreover, "the minimum contacts inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" *Lebel v. Everglades Marina, Inc.*, 558 A.2d 1252, 1255 (N.J. 1989) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "The 'minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297–98). Indeed, the three-part inquiry is meant to ensure that an out-of-state defendant will not be haled into court based on "random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person[.]" *Croat v. Mission Fine Wines, Inc.*, Civ. A. No. 19-17786, 2020 WL 1921955, at *4 (D.N.J. Apr. 21, 2020) (quoting *Stevens v. Welch*, Civ. A. No. 10-03928, 2011 WL 541808, at *3 (D.N.J. Feb. 7, 2011)). The plaintiff "bears the burden of demonstrating [that] contacts with the forum state [are] sufficient to give the court *in personam* jurisdiction." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 699 (3d Cir. 1990) (alterations in original) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984)).

### B.  Compelling Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, "establishes a policy in favor of arbitration that requires the liberal reading of arbitration agreements and the resolution of any doubts in favor of arbitration." *S. Broward Hosp. Dist. v. Medquist, Inc.*, 258 F. App'x 466, 467 (3d Cir. 2007) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25,

(1983)). The FAA provides: "[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. "Decades ago, the Supreme Court discussed 9 U.S.C. § 2 as 'a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 338 (3d Cir. 2023) (quoting *Moses*, 460 U.S. at 24). More recently, though, the Supreme Court explained that "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Moses*, 460 U.S. at 24). Rather, this policy "is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan*, 596 U.S. at 418 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan*, 596 U.S. at 418.

"[Q]uestions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citation omitted). "In considering a motion to compel arbitration, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement." *Thomas v. Jenny Craig, Inc.*, Civ. A. No. 10-02287, 2010 WL 3076861, at * 3 (D.N.J. Aug. 4, 2010) (first citing *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009), and then citing *Salvadori v. Option One Mortg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J. 2006)). "State contract principles apply in ascertaining whether the parties to an action have agreed to arbitrate." *Sarbak v. Citigroup Glob. Mkts., Inc.*, 354 F. Supp. 2d 531, 537 (D.N.J. 2004) (first citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and then citing

*Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)). "Under New Jersey law, '[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *Levy v. AT&T Servs., Inc.*, Civ. A. No. 21-11758, 2022 WL 844440, at *3 (D.N.J. Mar. 22, 2022) (alteration in original) (quoting *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017)). "Therefore, 'if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.'" *Id.* (quoting *Crawford v. Compass Grp. USA*, Civ. A. No. 14-02545, 2015 WL 1006389, at *3 (D.N.J. Mar. 6, 2015)). "To manifest assent, 'an offeree must provide 'unqualified acceptance,' which can be express or implied by conduct.'" *Id.* (quoting *Glob. TelLink Corp*, 852 F.3d at 265). For example, where employees are properly notified of an arbitration agreement and that they would assent through inaction unless they filled out an opt-out form, "failure to opt out of the arbitration through inaction [is] a proper method to assent." *Id.* at *4 (collecting cases).

"In examining whether certain claims fall within the ambit of an arbitration clause, a court must 'focus . . . on the "factual allegations in the complaint rather than the legal causes of action asserted."'" *Jayasundera v. Macy's Logistics & Operations, Dep't of Human Res.*, Civ. A. No. 14-07455, 2015 WL 4623508, at *2 (D.N.J. Aug. 3, 2015) (alteration in original) (quoting *Mut. Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853, 869 (D.N.J. 1992), *aff'd*, 970 F.2d 899 (3d Cir. 1992)). If the court determines that the claims in dispute fall within the scope of the arbitration agreement, the court "must then refer the dispute to arbitration without considering the merits of the case." *Id.*

"Where arbitrability is apparent on the face of the complaint, a Rule 12(b)(6) standard of review should be applied to the motion to compel arbitration." *Sauberman v. Avis Rent a Car Sys., L.L.C.*, Civ. A. No. 17-00756, 2017 WL 2312359, at *2 (D.N.J. May 26, 2017) (citing *Guidotti*,

716 F.3d at 774).

### III.   DECISION

#### A.  The Executives' Motion to Dismiss Rosa's Complaint

The Executives argue Rosa failed to meet his burden in sufficiently alleging facts that would allow this Court to exercise personal jurisdiction over them. (ECF No. 8 at 7.) They further argue that neither Musk nor Davis is subject to either general or specific jurisdiction in New Jersey. (*Id.*) Rosa responded that the Executives are subject to both general and specific jurisdiction in New Jersey as they have "purposefully availed themselves of the privilege of conducting activities in New Jersey." (ECF No. 12 at 2, 23–28.) Rosa argues Musk had a meeting with him over Google Teams and that Musk was "fully aware that Plaintiff was present in New Jersey and that Plaintiff conducted all of his duties from his home in New Jersey with periodic visits to Defendants' New York Office." (*Id.* at 20.) Rosa also states he met with Davis "over Google Meet from his home in New Jersey" and likewise that Davis was aware of Rosa "conduct[ing] the majority of his business duties from his home in New Jersey." (*Id.*) He emphasizes that Twitter addressed the offer letter to his New Jersey residence and that his various employment agreements were bound to the law of the state in which he resided. (*Id.* at 24, 27–28.) Rosa also argues his replacement at Twitter is another New Jersey resident, which makes the Executives' "affiliations with the State of New Jersey continuous and systematic rendering them at home in the forum." (*Id.*)

The Executives replied to Rosa's Opposition and stated Rosa "never explains how his claims 'arise out of or relate to' conduct that [the Executives] purposefully directed' at the forum. (ECF No. 16 at 1.) Further, they state "[b]y dodging these arguments and refusing to provide case law in support of his position, Plaintiff has waived his claims." (*Id.*) Notably, they highlight that "Plaintiff fails to address the [the Executive's] foundational argument that it was ***Twitter***, not Musk

or Davis, who employed and later terminated Plaintiff, and that all his claims relate to Twitter's conduct." (*Id.* at 3.)

Rosa has failed to establish general jurisdiction over either executive as "the paradigm forum for the exercise of general jurisdiction is the individual's domicile," and he has not alleged either executive is domiciled in New Jersey. *Murphy v. Eisai, Inc.*, 503 F. Supp. 3d 207, 223 (D.N.J. 2020) (citing *Goodyear Dunlop Tires Ops.*, 564 U.S. at 924). Principally, a "prima facie case for the exercise of personal jurisdiction" over the Executives is required as Rosa must establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 172 (D.N.J. 2016). As the Executives have pointed out, Rosa has not alleged direct actions by them other than knowing he resided in New Jersey and meeting with him over Google Meet since it was Twitter who employed him. Likewise, the various contracts that Rosa signed were with Twitter and not Musk or Davis.

Further, Rosa has failed to meet his burden of showing specific personal jurisdiction exists over the Executives because he has not sufficiently alleged, or otherwise shown, that the Executives "'purposefully directed' [their] activities at residents of the forum" and that his claims "'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 474; *Metcalfe*, 566 F.3d at 334. In other words, Rosa "has failed to establish the requisite 'purposeful availment' necessary for a finding of specific jurisdiction." *Croat*, 2020 WL 1921955, at *4. Rosa's residence in New Jersey alone is insufficient to find personal jurisdiction over individual employees of his former employer who do not have any other connection to New Jersey. *See Tripp*, 2023 WL 5425506, at *4.

Case law in this District establishes "that a remote worker based in New Jersey does not automatically confer personal jurisdiction over the out-of-state employer[.]" *Castillero v. Xtend*

*Healthcare*, LLC, Civ. A. No. 22-02099, 2023 WL 8253049, at *11 (D.N.J. Nov. 29, 2023); *see Tripp*, 2023 WL 5425506, at *4 ("An employee who works remotely from a home office, like [plaintiff], does not automatically subject his employer to the jurisdiction of his home state."); *see also Crosson v. TMF Health Quality Inst.*, Civ. A. No. 20-18800, 2023 WL 2609048, at *6 (D.N.J. Mar. 23, 2023); *Magill v. Elysian Glob. Corp.*, Civ. A. No. 20-06742, 2021 WL 1221064, at *7 (D.N.J. Apr. 1, 2021).

In *Croat v. Mission Fine Wines, Inc.*, the plaintiff argued specific jurisdiction existed because the New York-based defendant allowed her to work from her home in New Jersey one day per week. 2020 WL 1921955, at *4. The court disagreed and granted defendant's motion to dismiss for lack of personal jurisdiction, finding that plaintiff "made the personal choice of working from her residence at times when [d]efendant did not require [her] to work in either of its offices, *i.e.*, New York or Pennsylvania" and that those "were unilateral decisions by [p]laintiff and not the result of deliberate direction or requirement by [d]efendant" and therefore insufficient for specific jurisdiction over the out-of-state-based defendant. *Id.*

Similarly, in *Crosson v. TMF Health Quality Institute*, which involved an employment dispute arising from alleged retaliation in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. 10:5-1, *et seq.*, the plaintiff argued specific jurisdiction existed because: (1) the out-of-state-based defendants hired him as a remote employee; (2) he worked almost exclusively from his office in New Jersey; (3) he alleged the "[d]efendants engaged in continuous phone calls, letters, videoconferences calls, and emails to [him] while he was in New Jersey"; (4) "it was an express and substantial condition of [his] employment that he work from his office in New Jersey"; and (5) the defendants provided him with remote access software and a company-issued laptop so he could work from his home office in New Jersey. 2023 WL 2609048,

at *5. However, the defendants in *Crosson* contended no specific jurisdiction existed over them because: (1) they consisted of a non-profit corporation with its principal place of business in Texas and several individuals who were all citizens of Texas; (2) they had never had an office in New Jersey; (3) they conducted no business in New Jersey; (4) the plaintiff was a remote employee based exclusively out of the non-profit defendant's office in Texas; and (5) "all in-person meetings and events in which [p]laintiff participated during his employment with [the non-profit defendant] occurred in Texas." *Id.* at *4–5. The *Crosson* court agreed with the defendants and found the plaintiff was the defendants' only connection to New Jersey and that the plaintiff's specific allegations "fall short of demonstrating that [d]efendants conducted any business in New Jersey or targeted New Jersey in any purposeful way beyond permitting [p]laintiff to work remotely as a matter of his own convenience." *Id.* at *5–6.

Likewise, in *Higgins v. Newsmax Broadcasting LLC*, which also was a dispute alleging violations of NJLAD, the court found it did not have specific jurisdiction over the individual defendants. Civ. A. No. 23-03628 2024 WL 3064844, at *7–9 (D.N.J. June 20, 2024). The plaintiff was involved in a car accident that caused her to require an accommodation to work fully remote at her home in New Jersey until she was recovered enough. *Id.* at *2. Prior to the temporary disability, plaintiff "was working a hybrid work schedule where she worked four days a week" in the Newsmax New York office and "one day a week from her home in Weehawken, New Jersey." *Id.* The court found that the individual defendants did not work in New Jersey and that "[p]laintiff was not hired as a fully remote worker, nor was she hired to specifically service New Jersey residents. Rather, she was hired as an employee" for the New York office. *Id.* at *7. The court further found that the individual defendants allowed the plaintiff "to work from home one day a week as a matter of convenience" and she did not allege that she was ever "directed . . . to do this."

*Id.* at *8. In making its decision, the court relied on facts such as: "The Individual Defendants have never resided in New Jersey, have never owned any property in New Jersey, have never worked in New Jersey, have never met Plaintiff in person in New Jersey (with regard to her employment at Newsmax or otherwise), and were never physically present within New Jersey during any telephone or email communication with Plaintiff (whether in relation to her employment at Newsmax or otherwise)."*Id.*

Conversely, in *Castillero v. Xtend Healthcare, LLC*, the court found specific jurisdiction existed over a corporate defendant[4] (a Tennessee-based company) who hired a New Jersey resident "to work from her home in New Jersey as a bilingual customer service representative for [the company's] COVID-19 virtual call center that served residents in the State of New Jersey." 2023 WL 8253049, at *11. There, the court reasoned the company purposefully availed itself of New Jersey by hiring a New Jersey-based employee as a fully remote worker to work in New Jersey at its virtual call center in order to service New Jersey residents. *Id.* The *Castillero* court also noted that "'New Jersey has a strong interest in protecting its residents' in employment-related actions and that '[t]his need for protection is all the more true for New Jersey citizens working remotely for out-of-state employers.'" *Id.* (alteration in original) (quoting *Chadwick v. St. James Smokehouse, Inc.*, Civ. A. No. 14-02708, 2015 WL 1399121, at *6 (D.N.J. Mar. 26, 2015)).

In *Chadwick v. St. James Smokehouse, Inc.*, the court likewise concluded specific jurisdiction existed over two Florida-based defendants (one corporate and one individual) because

---

[4] The Executives argue in a footnote in their Reply that the allegations do not support personal jurisdiction over Twitter. (ECF No. 16 at 8.) Such a motion is not before this Court and accordingly will not be decided in this Opinion. However, discussion of when specific jurisdiction has been found for an out-of-state defendant, whether a corporation or an individual, is still useful in explaining this Court's rationale given Rosa has alleged much in the way of Twitter's actions versus those of the Executives.

the court found the defendants "purposefully availed" themselves of New Jersey by engaging in the following conduct: (1) the corporate defendant had done business with New Jersey businesses "on numerous occasions"; (2) the individual defendant admitted "he once had to appear in a small claims proceeding in New Jersey on behalf of [the corporate defendant] in order to resolve an unpaid debt with a New Jersey customer"; (3) defendants hired the plaintiff to be their "principal buyer and continuously relied on [p]laintiff to perform essential functions of its business from a remote office located in New Jersey"; (4) the defendants "engaged in continuous business phone and email interactions with [p]laintiff for almost two years" and "[i]n the course of their dealings with [p]laintiff, [they] offered to purchase and ship [] office equipment to [p]laintiff in New Jersey"; and (5) the individual defendant "made the phone call to the forum state to terminate [p]laintiff." 2015 WL 1399121, at *4–5.

Here, unlike the plaintiff in *Chadwick*, Rosa was not hired to perform "essential functions" for Twitter's "business from a remote office located in New Jersey," and Rosa has not alleged any facts as to the Executives like those regarding the individual defendant in *Chadwick*. Further, just as in *Higgins*, the Executives do not work in New Jersey because Twitter does not have any offices, remote or otherwise, located in New Jersey. Similarly, unlike the plaintiff in *Castillero* and just like the plaintiff in *Higgins*, Rosa was not hired as a fully remote worker, nor was he hired to specifically service New Jersey residents. Rather, he was hired as an employee for Twitter's Manhattan office. Indeed, Rosa provides his original employee contract with Twitter, which states, "You will be providing services from the Company's New York City, New York location." (ECF No. 12-4 at 3.) Rosa's contract also has a provision regarding Twitter's policies pertaining to working from home, but it does not direct him to do so. (*Id.* at 4.) Rosa has not provided any contract that deems him a remote worker, whether full-time or part-time, once he was promoted to

Head of Global Information Technology, Information Security, and Privacy.[5] Based on the exhibit

provided, Rosa was simply a "regular, full-time employee." (*Id.* at 3.)

Moreover, much of Rosa's Complaint and subsequent allegations revolve around Twitter's

actions and not those of the Executives. (*See generally* ECF Nos. 2, 12.)  The Executives point this

out explicitly in their Reply brief and provide multiple examples of Rosa's language being couched

in terms of the company contracting with him, revoking his access, firing him, etc. (ECF No. 16

at 7–8.) Rosa's chief allegation regarding the Executives' actions towards or in New Jersey is that

he had Google Meet meetings with both Musk and Davis and that Davis had provided instructions

to him on a few occasions. (ECF Nos. 2 at 8–9, 12 at 20.) However, such actions do not rise to the

level of either Executive directing his actions toward New Jersey. *See Sathianathan v. Pac. Exch.,*

*Inc.*, 248 F. App'x 345, 347 (3d Cir. 2007) ("The only contacts the individual defendants made

with the forum state in this case were a handful of telephone calls, e-mails, and letters apprising

appellant, a New Jersey resident, of the status of the arbitration."); *Nelligan v. Zaio Corp.*, Civ. A.

No. 10-1408, 2011 WL 1085525, at *5 (D.N.J. Mar. 21, 2011) ("Simply because Plaintiff

unilaterally decided to live and work in New Jersey is insufficient to show that [Plaintiff's boss]

directed this comment at the forum state. . . . In *Walburn,* the court explained that "[a] court cannot

automatically infer that a defendant expressly aimed its tortious conduct at the forum from the fact

that the defendant knew the plaintiff resided in the forum." (citing *Walburn v. Rovema Packaging*

*Machs., L.P.,* Civ. A. No. 07–3692, 2008 WL 852443, at *7 (D.N.J. Mar. 28, 2008))); *Knierim v.*

---

[5] Rosa states he was originally hired as "Head of Global Information Technology and Information Security." (*See generally* ECF Nos. 2, 12.) The employment contract he provides only states his title as "VP, Information Technology." (ECF No. 12-4 at 3). While Rosa appears to have contradicting information between his factual allegations and the exhibit he has provided, such a discrepancy does not have an impact on this Opinion. Indeed, when taking as true Rosa's allegation his original position was "Global" in oversight, this fact only further proves that he was not hired with a targeting of New Jersey or its residents.

*Siemens Corp.*, Civ. A. No. 06–4935, 2008 WL 906244, at *8 (D.N.J. Mar. 31, 2008) ("In their declarations, plaintiffs point exclusively to contacts between plaintiffs and [their employer] in New Jersey, regarding the formation and alleged breach of the employment contracts. However, those contacts are not sufficiently independent of [their employer] to establish specific jurisdiction."). Indeed, "the general rule in federal courts is that personal jurisdiction will not be exercised over an individual defendant for acts done in a corporate capacity." 3A Fletcher Cyc. Corp. § 1296.10. *See Parliament Imp. Co. v. Gibson Wine Co.*, 537 F. Supp. 75, 76 (E.D. Pa. 1982) ("The law is clear that an individual's transaction of business solely as an officer or agent of a corporation does not create personal jurisdiction over that individual. 'Whether the cause of action asserted against the individual is for breach of contract or for tortious actions, if the individual was functioning in the role of corporate officer or agent, he cannot become subject to the court's jurisdiction on the basis of those activities.'" (quoting *Feld v. Tele-View, Inc.*, 422 F. Supp. 1100, 1104 (E.D. Pa. 1976))).

Rosa has not sufficiently alleged, nor otherwise shown, that the Executives have purposefully availed themselves of New Jersey in the same way that the defendants in *Chadwick* and *Castillero* did. *See also Tripp*, 2023 WL 5425506, at *4–6 (granting motion to dismiss for lack of specific personal jurisdiction in a case alleging, *inter alia*, disability discrimination and unlawful retaliation in violation of NJLAD where the court found that although the plaintiff "worked remotely from his home in New Jersey, paid New Jersey taxes, collected New Jersey unemployment and disability benefits, received office equipment from [his out-of-state-based employer], and stored business-related documents in his home, those actions were not particular to New Jersey and could have occurred in any state" where the plaintiff chose to work, and concluding the foreign employer had "not purposefully availed itself of the New Jersey forum

under *O'Connor* (or expressly aimed its alleged tortious conduct at the New Jersey forum under *Calder*)").

Accordingly, the Executives' Motion to Dismiss Plaintiff's Complaint for lack of personal jurisdiction is **GRANTED**. There is no need for this Court to rule on the alternative Motion to Dismiss for failure to state a claim as it is moot given the dismissal on jurisdictional grounds.[6]

### B. Twitter's Motion to Compel Arbitration

Twitter argues since Rosa signed a "valid and binding arbitration agreement" governed by the FAA and which covers his alleged claims, he should be forced to proceed with arbitration as an initial course of action. (ECF No. 9 at 1, 3.) Twitter relies on Section 6 of the DRA, titled "Paying for the Arbitration," as it claims: "[I]n all cases where required by law, [Twitter] will be pay the Arbitrator's and arbitration fees." (*Id.* at 3.) They go on to emphasize the same section specifies, "If under applicable law [Twitter] is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator," arguing that this means equal apportionment of the remaining fees. (*Id.*)

Rosa relies on Section 5 of the DRA, believing it incorporates JAMS Rules, including JAMS Minimum Standards, as governing the arbitration process (*i.e.*, who pays what fees at the initial stage) along with the requirement that arbitration be brought before JAMS. (ECF Nos. 13 at 17, 13-1 at 4.) Plaintiff's counsel wrote at one point to the Defendants, "Section 6 of the agreement does not provide any language stating that it overrides any conflict with JAMS rules."

---

[6] Rosa requested in his Opposition to the Motion to Dismiss that he be allowed to amend his Complaint with respect to the breach of contract claim against the Executives. (ECF No. 12 at 31.) While he may be only opposing the Motion as to that specific claim having voluntarily dismissed the initial claims alleging violations of the respective Federal, New York, and California WARN Acts, it is moot since this Court is granting Twitter's Motion to Compel Arbitration. *See infra*.

(ECF No. 13-1 at 4.) Twitter's counsel disagreed with this interpretation, arguing "JAMS Rules cannot alter the parties' substantive rights and responsibilities under the agreement they both signed." (*Id.*)

As a result of this dispute and Twitter's refusal to pay more than half of the arbitration fees, Plaintiff argues Twitter has waived its right to compel arbitration. (*See generally*, ECF No. 13.) Plaintiff believes Twitter has acted in bad faith by not paying JAMS and, in his view, disregarding the DRA. (*Id.* at 11, 14.) Twitter insists the JAMS policy on arbitral fees cannot trump the material terms of the DRA and that its continued insistence on its contractual rights does not waive its right to arbitrate. (ECF No. 9 at 12–22.) Likewise, Twitter argues JAMS Minimum Standards are not incorporated into the DRA, although they do agree the arbitration itself is subject to the "then-current JAMS Rules." (*Id.* at 12–13.) Twitter cites to Section 10 of the DRA, which states it is the "'full and complete agreement relating to the formal resolution of [the covered] disputes . . .' so it cannot be supplemented with unwritten terms," referring to the Minimum Standards not being applicable. (*Id.*) Twitter also argues the Minimum Standards are different than JAMS Rules, as the Minimum Standards are "one of the JAMS Policies" and not "applicable law" as can be defined by Section 6 of the DRA. (*Id.* at 13.)

Finally, Twitter states the JAMS Minimum Standards are not applicable under its own rules since the Minimum Standards are applied "only when arbitration is 'required as a condition of employment,'" (*id.*), and the DRA "was ***not*** required as a condition of employment, as it expressly stated in bolded text: '**Arbitration is not a mandatory condition of Employee's employment at the Company**'" (*id.* at 14). Twitter supplements this argument with further reference to Section 8 of the DRA, which provided employees a period of 30 days after receipt of the DRA "to opt out and not be subject to [the] Agreement." (*Id.*) Both parties agree Rosa did not opt out of the DRA,

but Rosa contends that Twitter mandated he sign the DRA thus making it a condition of employment since he could only opt-out after signing it. (ECF No. 13 at 8.)

It is clear that an arbitration agreement is in place between Plaintiff and Twitter, and the claims Rosa has brought would fall under the DRA's provisions. Neither side is disputing this. The issue, therefore, is whether Rosa was forced to sign the DRA, which would mean the Minimum Standards would apply, and whether Twitter waived its right to compel arbitration by refusing to pay the JAMS fees, especially in light of the different interpretations of the DRA and what fee arrangement should take place. Determining these aspects will dictate whether this Court is forced to order arbitration pursuant to the FAA.

### i. Opt-Out Negates the Application of JAMS Minimum Standards

This court finds Rosa was not obligated to agree to a DRA as a condition of employment. Although Rosa notes he had to sign the DRA initially, an explicit opt-out period clearly denotes that it was not a required aspect of his employment to be under an arbitration agreement. *See Falk v. Aetna Life Ins. Co.*, Civ. A. No. 19-00434, 2019 WL 4143882, at *5 (D.N.J. Aug. 31, 2019) ("Plaintiff was free to decline [the arbitration agreement] and would not have suffered negative consequences as a result of his decision."); *Essex v. Children's Place, Inc.*, Civ. A. No. 15-5621, 2017 WL 6000347, at *5 (D.N.J. Dec. 4, 2017) ("Plaintiffs were not required to participate in TCP's arbitration program as a condition of employment with TCP. . . . [T]he Arbitration Agreement expressly state[s] that signing the Arbitration Agreement is not a mandatory condition of employment. . . . To the contrary, the Arbitration Agreement has a clear 'opt out' provision.").

JAMS's own rules state when an arbitration "based on a clause or agreement" is "required as a condition of employment," then JAMS "will accept the assignment only if the proceeding complies with the Minimum Standards." (ECF No. 9-4.) Accordingly, JAMS can conduct this

arbitration without applying the Minimum Standards since the DRA was not a requirement of employment at Twitter. Twitter has also noted it was the "JAMS Case Manager" who stated, "it was 'determined that the Employment Minimum Standards apply in this matter,'" and not the actual arbitrator making such a decision (ECF No. 17 at 4−5), *i.e.*, the Minimum Standards were being administratively applied. Rosa agreed that it was the "JAMS Case Manager [who] directed Defendants to pay the arbitration fees. . . . JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness apply." (ECF No. 13 at 18.) Further, Twitter argues Rosa has not substantively addressed any of the Section 6 and lack of incorporation arguments it has put forth, which should result in waiver of opposing its interpretations. (ECF No. 17 at 4−6.) *See Wysocki v. Wardlaw-Hartridge Sch.*, Civ A. No. 21-14132, 2022 WL 2168212, at *4 (D.N.J. June 16, 2022) (noting that "plaintiff conceded arguments where he failed to offer any substantive" response and finding "[f]ailure to raise legal arguments in opposition" results in waiver); *Powell v. Verizon*, Civ. A. No. 19-8418, 2019 WL 4597575, at *9 (D.N.J. Sept. 20, 2019) (finding plaintiff conceded arguments where he failed to offer any substantive arguments in response to a motion to dismiss); *O'Neal v. Middletown Twp.,* Civ. A. No. 18-5269, 2019 WL 77066, at *4 (D.N.J. Jan. 2, 2019) (same); *Person v. Teamsters Local Union 863*, Civ. A. No. 12-2293, 2013 WL 5676802, at *2 (D.N.J. Oct. 17, 2013) ("Failure to raise legal arguments in opposition to a motion to dismiss results in waiver.").

While the Court is inclined to find Rosa waived certain arguments, the Court nevertheless addresses all his arguments. Rosa's Opposition discusses his reliance on Section 5 and how if JAMS Rules and the Minimum Standards are all held to apply at this point then Twitter would be required to pay all upfront fees. However, he appears to have waived his opportunity to rebut the arguments put forth by Twitter on this topic because he has either not provided case law or properly

addressed Twitter's claims[7] for the validity of Section 6 and how it can be found to trump Section 5 or the JAMS Minimum Standards from applying, or as to why equal apportionment at this stage would be improper. (*See* ECF No. 13 at 9, 17.) Nonetheless, the arguments on why Section 6 should be considered valid, and why Twitter has not waived its right to compel arbitration will be discussed.

### ii.  Section 6 of the DRA Must Apply

Rosa correctly states arbitration agreements are required to be upheld by their specified terms pursuant to the FAA. (*See* ECF No. 13 at 17.) *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) ("Indeed, we have often observed that the Arbitration Act requires courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted.'" (citing *Am. Express Co. v. Italian Colors Rest.,* 570 U.S. 228, 233, (2013) (some emphasis added; citations, internal quotation marks, and brackets omitted))); *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 181 (3d Cir. 2010) ("[I]n the absence of a threshold question regarding

---

[7] Rosa cites to one case, *Lang v. PTC, Inc.*, Civ. A. No. 21-104451, 2021 WL 5277190 (D.N.J. Nov. 12, 2021), in order to support its claim that the JAMS Minimum Standards should apply, and Twitter should pay all costs except the initial filing fee. (ECF No. 13 at 8.) However, that case is distinguishable, as the court found: "The Agreement does not explicitly promulgate its own set of rules. Nor does it mandate fee-sharing, which could be held to override the arbitration rules. Rather, it contemplates that the arbitration will be administered by JAMS in the ordinary course." *Lang*, 2021 WL 5277190, at *5. Indeed, such a case seems to actually undermine Rosa's argument as Section 6 of the DRA does discuss fees. Likewise, Rosa has not provided cases explaining why an equal fee-apportionment is improper, instead, only arguing why JAMS's initial determination of the Minimum Standards is applicable. Accordingly, the Court can find he has forfeited arguing against Twitter's interpretation. Twitter notes its reading of Section 6 is "it requires equal fee-apportionment unless and until the arbitrator orders otherwise." (ECF No. 17 at 4.) As previously discussed, both Twitter and Rosa agree only the JAMS case manager has determined anything regarding fee apportionment and not an arbitrator. Rosa appears to exclusively rely on the case manager's decision along with its arguments for the general applicability of the Minimum Standards, all the while neglecting to substantively address many of Twitter's arguments.

the validity of the arbitration agreement itself or the applicability of an arbitration agreement to a given dispute, the FAA '*requires* courts to enforce privately negotiated agreements to arbitrate . . . *in accordance with their terms*.'") (internal citations omitted).

Twitter agrees with this sentiment, arguing Section 6 of the DRA must be given priority over any general terms and to simply disregard such an apportionment clause would make the language "completely meaningless, in violation of basic contract principles." (ECF No. 9 at 16–17.) This Court agrees with Twitter that Section 6 must not be found superfluous to the DRA, especially since the topic of fee payment is its own section of the agreement, and that its meaning must apply to the situation at hand. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 412 (2022) ("[A] court must hold a party to its arbitration contract just as the court would to any other kind."); *Singh v. Uber Techs., Inc.*, 571 F. Supp. 3d 345, 350 (D.N.J. 2021), *aff'd*, 67 F.4th 550 (3d Cir. 2023), *as amended* (May 4, 2023) ("In this sense, the FAA places arbitration agreements on equal footing with all other contracts and requires courts to enforce them according to their terms."). Accordingly, Section 6 is given the meaning asserted by Twitter.

### iii.  No Waiver of Right to Compel Arbitration

This Court finds that Twitter has not waived its right to compel arbitration. Rosa cites to various cases in arguing that Twitter has waived its right by breaching the arbitration agreement in its refusal to pay all JAMS initial fees. (ECF Nos. 2 at 3, 13 at 19–21.) In *Heisman v. Wyndham Vacation Resorts, Inc.*, the court found the defendant had waived its right to compel arbitration since it obstructed the American Arbitration Association ("AAA") process it had agreed to go through by "fail[ing] to comply with the AAA's policies." *See* Civ A. No. 20-11480, 2021 WL 1138125, at *1 (D.N.J. Mar. 22, 2021). As a result, the AAA "declined to administer the claim." *Id.* Further, that court made clear:

24

> A party cannot raise unjustifiable objections to a valid demand for arbitration, all the while protesting its willingness in principle to arbitrate and then, when the other side has been forced to abandon its demand, seek to defeat a judicial determination by asking for arbitration after suit has been commenced.

*Id.* at *3 (internal citation omitted) (citing *Stanley v. A Better Way Wholesale Autos, Inc.,* Civ. A. No. 17-01215, 2018 WL 3872156, at *6 (D. Conn. Aug. 15, 2018)). Ultimately, "Wyndham itself defeated the plaintiffs' filing of a claim in Wyndham's chosen AAA forum by failing to cooperate. It has waived its right to arbitrate." *Id.* Here, Twitter has not raised an "unjustifiable objection" as it has not refused to participate in the same manner as occurred in *Wyndham*, instead simply requesting the DRA be upheld and enforced to then arbitrate. Twitter has maintained that if the fees are split according to its arbitration agreement with Rosa, then the arbitration would occur. Likewise, unlike the AAA declining to arbitrate due to Wyndham's refusal, JAMS has not formally declined Rosa's case.

Rosa also relies on *Page v. GPB Cars 12, LLC*, in attempting to demonstrate a defendant's conduct that a court found to be a waiver of the right to compel arbitration. However, that case is distinguished from the one before this Court by the fact that the arbitration agreement there explicitly stated the defendant would "advance both party's filing, service, administration, arbitrator, hearing, and other fees, subject to reimbursement by decision of the arbitrator." Civ. A. No. 19-11513, 2019 WL 5258164, at *2 (D.N.J. Oct. 17, 2019). Here, there is no such provision. Likewise, Rosa's citation to *Hernandez v. MicroBilt Corp.*, while apt as it shares similarities to the current matter, is also not sufficiently analogous. The AAA there had made an administrative decision stating its rules and an arbitration provision were in conflict requiring the defendant to waive the provision. 88 F.4th 215, 217 (3d Cir. 2023). Here, the Court has found JAMS Minimum Standards not applicable given that Rosa could have opted out of the DRA, thus making no conflict between any provisions and the Minimum Standards. Rosa further cites to *Passion for Restaurants,*

*Inc. v. Villa Pizza, LLC*; however, that court found the arbitration agreement was "governed by the UNCITRAL Arbitration Rules, which vests discretion in the arbitrator to determine how to allocate the costs of the arbitration and allow the arbitrator to request deposits form the parties." Civ. A. No. 20-15790, 2022 WL 18024209 at *5 (D.N.J. Dec. 30, 2022). That defendant subsequently refused to pay its portion of the fees despite the arbitration agreement and outlined rules distinctly providing the arbitrator the ability to determine the fee split. Here, Twitter has requested multiple times to pay half of the fees in line with its interpretation of the DRA. (*See generally* ECF Nos. 9, 17.)

Twitter presents multiple arguments and cases where courts found a defendant's refusal to pay the full fees as neither in bad faith nor a waiver of the DRA. (*See* ECF Nos. 9 at 18–22, 17 at 9–15.) For example, one such case, *Brown v. Peregrine*, seems most analogous to the current situation. *See* Civ A. No. 22-2959, 2023 WL 8800728 (2d Cir. Dec. 20, 2023). In *Brown*, the AAA had applied its own fee schedule and required the plaintiff to cover the filing fee and the defendant the rest. *Id.* at *1. That defendant stated it was "'ready, willing, and able to proceed to arbitration on terms consistent with the provisions set forth in the arbitration agreements entered into between each [plaintiff] and [defendant]'. . . 'it requested[ed] that the AAA . . . equalize the parties' filing fees' since the arbitration provisions provide that the parties would equally share arbitration costs prior to any final determination by the AAA." *Id.* (internal citations omitted). The AAA "administratively closed [its] file in th[e] matter," similar to what Rosa has alleged has occurred here. *Id.* The AAA went a step further than what has occurred here with JAMS, though, as the AAA there "declined to administer any future employment matter[s] involving [defendant]." *Id.* (internal citations omitted). Ultimately, the Second Circuit found that the defendant could not have been found to waive its arbitration rights. *Id.* at *3 ("Even if it could be argued that the AAA was

justified in insisting on Peregrine's compliance with its Fee Schedule to commence arbitration, Peregrine cannot be faulted for standing on its contractual entitlements under the ELAs, given the parties' express agreement that the ELAs' arbitration provisions would supersede any of the AAA's rules to the extent the two might conflict. . . . In light of the clear terms of the ELAs, it cannot be said that Peregrine acted so inconsistently with its arbitration rights as to have waived them when it invoked contractual protections for which it had negotiated."). *See Billie v. Coverall N. Am. Inc.*, Civ. A. No. 22-718, 2023 WL 2531396, at *3 (2d Cir. Mar. 15, 2023) (finding defendant was not "in default" when defendant refused to advance fees and the arbitration agreement stated costs of the arbitration would be "shared equally between the Parties"). Just as in *Brown*, Twitter has repeatedly stated it is willing and able to arbitrate if its interpretation of the DRA is upheld, and Rosa pays his half of the fees.[8] (*See generally* ECF Nos. 9, 17.) Likewise, Rosa has not made an allegation or provided documentation regarding JAMS formally declining to take the case as JAMS administratively needed the initial retainer fees paid for before an arbitrator would get involved.[9] While not binding on this Court, the similarities are persuasive enough to determine

---

[8] As part of its argument, Twitter cites to *Weber v. X Corp.* as being instructive given the similar arbitration dispute. That court did not find waiver or bad faith, holding, "[t]he text of the DRA makes it self-evident that the parties did not intend for arbitration to commence according to procedures delineated by JAMS," and ultimately ordered "the parties to proceed to arbitration and to strictly observe the terms of the DRA." Civ. A. No. 23-0233, 2024 WL 470255, at *6–8 (E.D. Wash. Jan. 8, 2024).

[9] Rosa states in his Opposition that JAMS has closed the arbitration file "[a]s a result of Defendants' non-payment." (ECF No. 13 at 6.) Rosa provides no date or record of this action beyond the statement. Exhibit I attached to the Opposition only shows JAMS writing back to Rosa's counsel: "Noted," after being informed about this federal Complaint. (ECF No. 13-10 at 1.) Regardless, no formal declination appears to have occurred.

Twitter has not acted in bad faith in remaining steadfast to its belief in the contractual terms as being explicit for fee-sharing and as superseding JAMS Minimum Standards.

### iv.  Request for Other Arbitral Forum

Lastly, Twitter requests that if JAMS is unavailable as an arbitral forum that this Court designate another arbitrator. (ECF No. 9 at 22–24.) Rosa does not dispute this request in his Opposition. (*See* ECF No. 13.) Under FAA § 5, this Court has the authority to grant this request. *See Khan v. Dell Inc.,* 669 F.3d 350, 354 (3d Cir. 2012) ("[A] court will decline to appoint a substitute arbitrator, as provided in the FAA, only if the parties' choice of forum is 'so central to the arbitration agreement that the unavailability of that arbitrator [brings] the agreement to an end.' *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2006). In this light, the parties must have unambiguously expressed their intent not to arbitrate their disputes in the event that the designated arbitral forum is unavailable."). However, the request is denied at this time because there has been no determination that JAMS is not still a viable method for arbitration as long as the initial fees are paid.

Accordingly, Twitter's Motion to Compel Arbitration is **GRANTED**. Given this Court's authority under FAA § 5, the parties are ordered to arbitrate pursuant to the terms of the DRA. Rosa and Twitter shall each pay half of the requisite JAMS fee in order to properly initiate

arbitration proceedings as Section 6 of the DRA is given effect regarding apportionment of the initial fee-sharing since JAMS Minimum Standards is inapplicable.

## IV.    CONCLUSION

For the reasons set forth above, the Executives' Motion to Dismiss (ECF No. 8) is **GRANTED**, Twitter's Motion to Compel Arbitration (ECF No. 9) is **GRANTED**, and Rosa's Complaint (ECF No. 2) is **DISMISSED WITHOUT PREJUDICE**.[10] An appropriate Order follows.


*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated: November 27, 2024

---

[10] The Court dismisses rather than stays this action pending arbitration because neither party requested the action be stayed pending arbitration. *See Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 490 (E.D. Pa. 2011) (dismissing plaintiffs' amended complaint and closing case after granting defendants' motion to compel arbitration, reasoning that while the Third Circuit "has noted that 'the plain language of [FAA] § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration,'" neither party in this case requested the action be stayed pending arbitration (first alteration in original) (quoting *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004))).